866 F.2d 1343
 57 USLW 2540, 57 USLW 2550
 UNITED STATES of America, Plaintiff-Appellee,
v.
Jeffrey Michelotti BISSELL and Theophilos E.M. Nicholis,
Defendants- Appellants.
UNITED STATES of America, Plaintiff-Appellee,
v.
Carlos CARABALLO-SANDOVAL and Henry Caraballo-Sandoval,
Defendants- Appellants.
UNITED STATES of America, Plaintiff-Appellee,
v.
Rolando ZALDIVAR, Sr., Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Carlos CARABALLO-LUJAN, Defendant-Appellant.
 Nos. 87-8246, 87-8311, 87-8395 and 87-8504.
 United States Court of Appeals,
Eleventh Circuit.
 March 2, 1989.
Rehearing Denied in Nos. 87-8246 and 87-8395 April 13, 1989.
Rehearing and Rehearing in Banc Denied in Nos. 87-8311 and
87-8504 April 13, 1989.
 
 Douglas N. Peters, Decatur, Ga. (court-appointed), for Nicholis.
 Donald I. Bierman, Pamela I. Perry, South Miami, Fla., for Bissell.
 Wilmer Parker, III, Asst. U.S. Atty., Atlanta, Ga., for U.S. in Nos. 87-8246, 87-8395, 87-8504.
 Bruce S. Harvey, Atlanta, Ga., for defendants-appellants in No. 87-8311.
 James Ponsoldt, Athens, Ga., (court-appointed), for Henry Caraballo.
 Robert L. Barr, Jr., U.S. Atty., Wilmer Parker, III, Asst. U.S. Atty., Atlanta, Ga., for U.S. in No. 87-8311.
 Donald I. Bierman, Bierman, Shohat & Loewy, Miami, Fla., Benton L. Becker, Law Office of Benton L. Becker, Coral Gables, Fla., Arthur Joel Berger, Miami, Fla., for Zaldivar.
 Robert Altman, Atlanta, Ga., (court-appointed), for Caraballo-Lujan.
 Appeals from the United States District Court for the Northern District of Georgia.
 Before HILL and FAY, Circuit Judges, and DUBINA*, District Judge.
 HILL, Circuit Judge:
 
 
 1
 A jury convicted Carlos Caraballo-Lujan, Carlos Caraballo-Sandoval, Henry Caraballo-Sandoval, Rolando Zaldivar, Jeffrey Bissell and Theophilis Nicholis for their participation in a conspiracy to import cocaine into the United States from Colombia, South America. The conspiracy committed several acts of cocaine importation between 1983 and 1986, involving numerous other co-conspirators. In this appeal, we consider thirteen issues, and, for the reasons stated below, we hold that no reversible errors occurred in the trial of this case.
 
 
 2
 * On or about June/July 1983, Carlos Caraballo-Lujan (Carlos Caraballo, Sr.), and his son, Carlos Caraballo-Sandoval (Carlos Caraballo, Jr.), arranged to smuggle approximately 300 kilograms of cocaine from Colombia into the United States. They met with co-conspirator Marty Daniel, who testified for the government at trial, and asked him to find a pilot, an airplane and a landing strip. Accordingly, Daniel introduced the Caraballos to appellant Theophilos Nicholis, an experienced pilot who had previously been involved in smuggling marijuana from Jamaica into the United States.[1] Nicholis agreed to smuggle the drugs, and Carlos Caraballo, Sr. paid the pilot $25,000 to prepare an airplane for the trip. The preparations, however, did not go smoothly. Nicholis encountered difficulties in locating a clandestine landing strip and in solving his airplane's fuel consumption problems. As a result, Nicholis stalled, and Carlos Caraballo, Sr. grew impatient. Carlos, Sr. ordered Marty Daniel to retrieve the $25,000 from Nicholis. Daniel did so, and Carlos Caraballo, Sr. found another pilot who successfully smuggled the cocaine.
 
 
 3
 A second importation of 300 kilograms of cocaine occurred in May/June 1984. Appellant Carlos Caraballo, Jr. requested the help of Marty Daniel in locating another pilot. That pilot was David Burt, who also testified for the government at trial. Burt met with Carlos, Sr., Carlos, Jr., appellant Henry Caraballo-Sandoval--also a son of Carlos, Sr.--and other co-conspirators to plan the trip. Burt proposed to fly an airplane laden with cocaine from Colombia over the Yucatan Peninsula into an area full of oil derricks in the Gulf of Mexico. At that point, he would fly his airplane at a slow speed and at a low altitude, as would an oil supply helicopter, in order to avoid radar detection by law enforcement authorities. Further, he proposed to land the airplane at a clandestine landing strip in Pike County, Georgia, which lies in the Northern District of Georgia. The conspirators agreed with the plan, and, subsequently, Carlos, Sr. offered Burt over $200,000 to make the trip. While not agreeing on a price, Burt nonetheless agreed to fly for the Caraballos. Preparations then ensued, which included the installation of an extra fuel tank in the airplane and frequent trips by the conspirators to Atlanta and Pike County in order to survey the landing strip.
 
 
 4
 Burt completed a successful flight to Colombia and back to Georgia, bringing with him 300 kilograms of cocaine. Carlos, Sr. and other co-conspirators met Burt at the Pike County landing strip. They unloaded the cocaine and stored it at a farm near Cordelle, Georgia where Carlos Caraballo, Jr. awaited. The Caraballos then arranged for a drug courier to transport the cocaine to Miami. Carlos, Jr. paid Burt only $100,000 for his services, while Henry Caraballo paid Marty Daniel for his efforts by delivering to him four kilograms of cocaine. Daniel and Burt were upset with the payments since they fell far short of their expectations. However, after the conspirators threatened to kill Daniel upon further complaints, Daniel and Burt protested no further.
 
 
 5
 In March, 1985, the conspirators again attempted to smuggle cocaine into the United States. The Caraballos employed a new pilot, appellant Jeffrey Bissell. Bissell, together with co-conspirator Cappy Verplank, planned to fly an airplane to Colombia, fill it with cocaine, and then fly it to Long Island in the Bahamas. The cocaine would be smuggled subsequently into the United States. The plan failed, however, because low fuel and bad weather forced Bissell to land on Lee Stocking Island, a private island in the Exuma chain of the Bahamas. Upon landing, the island's security guard, Robert Wicklund, apprehended Bissell and Verplank, accusing them of being drug smugglers. Bissell responded, "I guess you figured that out." Later, Bahamian authorities arrested Bissell and Verplank, and a search of the landing strip revealed eighteen duffel bags containing approximately 691 kilograms of cocaine and a maroon bag. Bissell confessed to Bahamian authorities that the maroon bag belonged to him. The capture of the pilots and cocaine ended the smuggling operation.
 
 
 6
 Not to be deterred, the Caraballos sought to import another cargo of 600 kilograms of cocaine in October, 1985. To accomplish the venture, the Caraballos expanded their operation into a 50/50 partnership with appellant Rolando Zaldivar and his organization. Also, the conspirators employed yet another new pilot, Steve Smith, who, like co-conspirators Marty Daniel and David Burt, cooperated with the government in this case. Smith would fly a Mitsubishi MU 2 aircraft purchased by Zaldivar between Colombia and a clandestine airstrip in Georgia. Initially, the conspirators considered using the Pike County, Georgia airstrip, and they traveled to the Northern District of Georgia to survey the facility. But, in the end, the conspirators chose a landing strip in Cuthbert, Georgia provided by two undercover agents of the Drug Enforcement Administration (DEA).
 
 
 7
 Numerous planning sessions occurred at the home of appellant Zaldivar in anticipation of smuggling 600 kilograms of cocaine in October, 1985. At one session, attended by Rolando Zaldivar, Carlos, Sr., Carlos, Jr., Henry Caraballo, Rolando Zaldivar's three sons, co-conspirator Carlos Vasquez (a/k/a "Fat Carlos"), Marty Daniel and pilot Steve Smith, the conspirators vigorously debated how much cocaine could be transported in the MU 2 aircraft. For example, Zaldivar's son, Miguel Zaldivar, told his father that the airplane would be dangerously overweight, necessitating a reduction in the amount of cocaine. However, Zaldivar ordered his son and the other conspirators to recompute figures relating to the airplane's fuel capacity and range. Similarly, when pilot Smith suggested a reduction in the amount of cocaine to Carlos, Sr., Carlos, Sr. refused to consider the idea, stating that he was committed to smuggling 600 kilograms. In the end, the fathers had their way, and the conspirators settled on a plan in which the airplane would carry 600 kilograms of cocaine between Colombia and Cuthbert, Georgia.
 
 
 8
 This plan failed also, however. The MU 2 ran out of fuel, and pilot Smith landed the airplane at Bay Minnette, Alabama. Smith abandoned the airplane and the cocaine on board. While Smith was aborting the trip, the conspirators, including the three Caraballos and undercover DEA agents, waited at the landing strip. At 3:30 a.m., the conspirators received news of Smith's landing at Bay Minnette. They attempted to salvage the cocaine, but law enforcement authorities seized the MU 2 and approximately 566 kilograms of cocaine. Thereafter, the conspirators blamed Steve Smith and Marty Daniel for the failure at Bay Minnette. Rolando Zaldivar was particularly enraged at losing the cocaine. Zaldivar's son, Miguel, informed Smith and Daniel that their lives were in peril. However, at a meeting attended by the Caraballos and Rolando Zaldivar, the conspirators decided that no one would be killed.
 
 
 9
 Subsequently, DEA undercover agents maintained their relationship with the Caraballos. In January, 1986, for instance, Carlos, Jr. and Henry Caraballo proposed another smuggling venture to the agents. That venture never matured. Nevertheless, during this period, Carlos, Jr. managed to import successfully 100 kilograms of cocaine into Washington, D.C. The DEA finally arrested the Caraballos on May 29, 1986. A search of the Caraballo home pursuant to a warrant revealed 17 kilograms of cocaine, nine weapons, including an illegal machine gun, and $120,000 in U.S. currency. Also, on June 2, 1986, pursuant to a search warrant, the government found 45 kilograms of cocaine in a warehouse in Hialeah, Florida, leased by a corporation owned by Henry and Carlos Caraballo, Jr.
 
 
 10
 A grand jury sitting in the Northern District of Georgia returned an indictment on April 10, 1986, a superceding indictment on May 15, 1986, and a second superceding indictment on July 8, 1986, which charged forty-one defendants with various violations of federal narcotics laws. The grand jury charged, inter alia, that the three Caraballos, Rolando Zaldivar and Nicholis had violated the Racketeer Influenced And Corrupt Organizations Act (RICO), 18 U.S.C. Sec. 1961 et seq., and that Zaldivar and Carlos, Sr. had engaged in a Continuing Criminal Enterprise (CCE), in violation of 21 U.S.C. Sec. 848. Bissell was charged with conspiring to import cocaine. In addition, the superceding indictments contained several forfeiture counts pursuant to 21 U.S.C. Sec. 853, in which the grand jury alleged that all assets derived from, or devoted to, violations of federal narcotics laws were subject to forfeiture upon appellants' convictions. Consequently, the government imposed pretrial restraints on those assets in order to preserve them pending trial. For example, the government obtained ex parte warrants which froze assets in bank accounts belonging to the Caraballos. The warrants described the bank accounts and the district court's probable cause determination that the assets were derived from drug trafficking. The government executed the warrants, thereby securing the assets and rendering them unavailable to the appellants before trial.
 
 
 11
 Ultimately, the case against the forty-one defendants was severed into three trials, and the six appellants were tried jointly and convicted for their roles in the conspiracy.[2] The appellants raise thirteen issues on appeal. They challenge (1) the constitutionality of the ex parte, pretrial restraints on their assets, (2) the striking of certain surplus information from the indictment and (3) the government's proof at trial which, according to the appellants, varied from the terms of the indictment. Also, appellants contest the district court's denial of their motions for (4) severance, (5) change of venue, (6) suppression, (7) exclusion of prior crime evidence, and (8) exclusion of co-conspirator evidence. Furthermore, the appellants claim (9) that DEA agents and the prosecutor committed misconduct, (10) that the government committed violations of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), (11) that the district court erred in denying their requested jury instructions and in charging the jury, (12) that the district court erred in sentencing Carlos Caraballo, Sr. and Henry Caraballo, and, finally, (13) that the evidence was insufficient to sustain their convictions.
 
 
 12
 Having carefully reviewed the record and briefs, we find that appellants' contentions in issues three through twelve are without merit. Further, we hold that the evidence supported all of the appellants' convictions. However, since we affirm the CCE convictions of Carlos Caraballo-Lujan and Rolando Zaldivar, we must vacate their convictions and sentences under the conspiracy counts (counts 11 and 12) because they merge, as a matter of law, with the CCE convictions. United States v. Cruz, 805 F.2d 1464, 1468 (11th Cir.1986); United States v. Harrington, 761 F.2d 1482, 1487 (11th Cir.1985). We now consider the remaining issues.
 
 II
 
 13
 1. Pretrial Restraints of Assets.
 
 A. The Statutory Provisions
 
 14
 Pursuant to 21 U.S.C. Sec. 853(a), defendants convicted of serious federal narcotics offenses must forfeit to the United States any assets derived from, or used in, the commission of those crimes.[3] Forfeiture, as with the commission of an offense, is alleged in an indictment or information. To preserve forfeitable assets for a possible conviction, the district court may restrain the defendant from using these assets before trial. The restraints may be imposed by way of a restraining order, an injunction, the execution of a performance bond, or a temporary seizure of certain assets which, because of their liquidity, can be readily transferred or hidden. 21 U.S.C. Sec. 853(e)(1)(A) and (f). Moreover, once an indictment has issued, the court may order such restraints ex parte. Id. These restraining order provisions do not, on their face, require a hearing either prior to, or after, the imposition of restraints on defendants' assets. The statute's legislative history reveals that while Congress did not intend for there to be a hearing prior to the issuance of a restraint, the district court does retain authority to hold a post-restraint hearing. S.Rep. No. 225, 98th Cong., 1st Sess. 191, 203, reprinted in 1984 U.S. Code Cong. & Admin.News 3182, 3386. At that hearing, the defendant may undertake to prove that the government wrongfully restrained specific assets which are outside the scope of the indictment, not derived from, or used in, criminal activity, but may not challenge the validity of the indictment itself and thus require that the government present its evidence before trial.
 
 
 15
 The reason for restricting the defendant's control over allegedly illicit assets is to preserve the government's claim of ownership to these assets and to protect its right to possession of the assets when and if its claim is vindicated at trial. That claim is founded on the principle that the fruits and instrumentalities of a crime do not belong to the criminal, but rather to the government. The statute vests the government with legal title to illicit assets at the time the offense is committed.[4] As such, the government's interest is said to "relate back" to the time of the criminal act. Of course, final adjudication of the government's claim is not resolved until trial, at which time the defendant may ultimately be found entitled to these assets should the government fail to prove its case for forfeiture. Inasmuch as under the relation back provision the government asserts a significant claim to the defendant's assets before trial, the pretrial restraint provisions in section 853 protect that claim by preserving these assets for possible forfeiture.
 
 
 16
 As a consequence of the provisions in section 853, an attorney retained to defend one whose assets are subject to forfeiture and restraint may go uncompensated. This would be the case where, as here, all of the defendant's assets are alleged to be subject to forfeiture and are thus unavailable for any use. If the defendant is convicted, the attorney will have no right to assets once in possession of his client because the government's title--vesting at the time of the offense--will usually predate the attorney's claim.[5] This scenario may cause many lawyers to refuse representation of a defendant whose apparent assets are frozen before trial and which may be subject to forfeiture upon conviction. Because this circumstance has raised Sixth Amendment concerns with some judges, courts have ruled that section 853 exempts funds to be used for attorney's fees from pretrial restraints and forfeiture. See, e.g., United States v. Rogers, 602 F.Supp. 1332, 1348 (D.Colo.1985); United States v. Ianniello, 644 F.Supp. 452, 455-56 (S.D.N.Y.1985). We reach a different conclusion. The language and legislative history of section 853 evidence Congress' goal of reaching as many illegal assets as constitutionally permissible. Therefore, we agree with the conclusions of the Fourth, Seventh and Tenth Circuit Courts of Appeals that 21 U.S.C. Sec. 853 reaches all illegal funds, including those earmarked for payment to attorneys. See In re Forfeiture Hearing As To Caplin & Drysdale, 837 F.2d 637, 641-2 (4th Cir.1988) (en banc), cert. granted, Caplin & Drysdale, Chartered v. United States, --- U.S. ----, 109 S.Ct. 363, 102 L.Ed.2d 352 (1988); United States v. Moya-Gomez, 860 F.2d 706, 723 (7th Cir.1988); United States v. Nichols, 841 F.2d 1485, 1491-96 (10th Cir.1988). Given such a conclusion, however, we must decide the constitutional questions.
 
 B. The Issues
 
 17
 "When the right point of view is discovered, the problem is more than half solved." Ellison v. Georgia Railroad Company, 87 Ga. 691, 706-707, 13 S.E. 809 (1891) (Bleckley, C.J.).
 
 
 18
 Appellants have questioned the constitutionality of those parts of RICO and CCE which provide for restraints upon money and other assets found in the possession of the appellants at the time of the arrests. We find two principal issues involved in analyzing these provisions, and one issue may be divided into two parts. First, we must decide whether the restraint placed upon alienation of these assets violates the Sixth Amendment to the Constitution by making it impossible for defendants to secure the services of counsel of their choice. Second, we must analyze the due process clause implications of the application of such restraints. Attachment, sequestration, and other restraint placed upon property prior to judgment may, when done improperly, amount to the taking of property without due process of law. If the interference with the use of property does, itself, pass constitutional muster, we must yet examine the implications resulting from the exercise of the power to restrain the alienation of assets by the same executive who is prosecuting criminal charges against those no longer able to use assets which had theretofore been in their possession.
 
 
 19
 It will be necessary that we obtain the right point of view. The issues ought not be viewed as involving the government's efforts to collect an indebtedness coincidentally with the prosecution of criminal charges. The position of the government is not that defendants are indebted to the government and that the assets seized or restrained ought to be applied to that indebtedness. The correct position is that none of the defendants have ever owned any of these assets. All of the assets were the property of the government the moment they were derived from, or utilized in, the criminal activities condemned. The government's position is that the defendants have been found, perhaps as paupers, holding assets belonging to the government as to which the defendants have never had any more right than would a thief.
 
 C. The Sixth Amendment Issue
 
 20
 The Caraballo appellants do not contend that the government wrongfully restrained assets having no connection with criminal activity. That is, they do not claim that the government restrained non-forfeitable assets. Rather, the appellants contend that the Sixth Amendment requires that enough funds be exempt from pretrial restraints and forfeiture to pay for counsel of choice and other litigation expenses. Specifically, they argue that the Sixth Amendment protects the individual's right to select and be represented by his preferred attorney with assets in his possession at the time of arrest. Moreover, appellants contend that the Sixth Amendment's guarantee of a fair adversarial process may be undermined by the government's power to force apparently wealthy defendants into indigence, thereby requiring appointment of counsel who may be inexperienced in trying complex RICO and CCE cases. As a result, the defense may be overmatched. Thus, the appellants urge that to protect a Sixth Amendment interest in a vigorous adversarial process, as well as an individual's interest in selecting counsel of choice, the Constitution requires the exemption of funds which are sufficient to allow defendants to retain their preferred counsel. We disagree.
 
 
 21
 The Sixth Amendment comprehends a qualified right to select and be represented by counsel of choice because "were a defendant not provided the opportunity to select his own counsel at his own expense, substantial risk would arise that the basic trust between counsel and client, which is a cornerstone of the adversary system, would be undercut." United States v. Koblitz, 803 F.2d 1523, 1528 (11th Cir.1986) (emphasis added). But, as the quotation implies, the right to counsel of choice belongs solely to criminal defendants possessing legitimate, uncontested assets. Here, the inclusion of appellants' assets in an indictment is an assertion that these particular defendants, no matter what the appearances of wealth may be, are and have been paupers ever since their apparent assets were accumulated through criminal conduct. As such, they have no legitimate assets with which to pay an attorney. An analogy from the Fourth Circuit illustrates this point:
 
 
 22
 Suppose a bank is robbed and $100,000 taken. A defendant is arrested in possession of $100,000 and nothing more. The defendant protests his innocence and claims, without the slightest proof, that the $100,000 was in fact a gift from a friend. Surely no one will contend that the $100,000 must be made available to pay the defendant's lawyer, and not be kept available for return to the bank in the event the defendant is found guilty.
 
 
 23
 Caplin & Drysdale, 837 F.2d at 645. Similarly, the appellants here had no Sixth Amendment right to use assets to the extent that those assets belonged to the United States. That the appellants could not, as a result, afford private counsel is of no Sixth Amendment significance; a defendant may not insist on representation by an attorney he cannot afford. Wheat v. United States, --- U.S. ----, 108 S.Ct. 1692, 1697, 100 L.Ed.2d 140 (1988).
 
 
 24
 Of course, indigence does not impair the defendant's right to a fair trial. The Sixth Amendment requires the appointment of counsel in every trial for a serious crime, Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963), and counsel must play "the role necessary to ensure that the trial is fair." Strickland v. Washington, 466 U.S. 668, 685, 104 S.Ct. 2052, 2063, 80 L.Ed.2d 674 (1984). This latter inquiry focusses on competency, and it is this criteria, rather than whether counsel is appointed or retained privately, that is critical to a fair trial. Otherwise, the government could not constitutionally prosecute defendants who happen to be without funds at the time of arrest. Having received competent representation by appointed counsel in this case, the appellants, who had no uncontested assets with which to retain an attorney, suffered from no deprivation of their Sixth Amendment rights.[6]D. The Due Process Issue
 
 
 25
 The statutory scheme in 21 U.S.C. Sec. 853(e)(1)(A) does not specifically provide for a hearing to challenge the merits of the government's case on forfeiture either prior to, or after, allegedly illicit assets are restrained. The only hearing provided is the trial. The Caraballo appellants contend that this scheme violates due process. They argue that when pretrial restraints are imposed on assets, the Fifth Amendment requires a hearing on the merits at which the government must prove the probability that the defendant will be convicted and that his assets will be forfeited. Since no such hearing occurred in this case, appellants urge that they have been denied due process of law. We disagree.
 
 
 26
 The Fifth Amendment provides that "[n]o person shall ... be deprived of ... property ... without due process of law...." U.S. Const. amend. V. This clause is implicated when, as here, persons are deprived of their possessory interests in property. Fuentes v. Shevin, 407 U.S. 67, 84, 92 S.Ct. 1983, 1996, 32 L.Ed.2d 556 (1972). The Fifth Amendment generally prohibits the deprivation of property without a prior hearing, id. at 90, 92 S.Ct. at 1999, but one exception to the need for a prior hearing exists when the government seizes items subject to forfeiture. Calero-Toledo v. Pearson Yacht Leasing Co., 416 U.S. 663, 679-80, 94 S.Ct. 2080, 2089-90, 40 L.Ed.2d 452 (1974). Thus, appellants had no right to a hearing before the government restrained their assets. We must consider whether appellants had a right to an immediate post-restraint hearing.
 
 
 27
 Our analysis is guided by the Supreme Court's decision in United States v. Eight Thousand Eight Hundred and Fifty Dollars ($8,850) In United States Currency, 461 U.S. 555, 103 S.Ct. 2005, 76 L.Ed.2d 143 (1983) ("United States v. $8,850 "). There, customs officials seized currency pursuant to the Bank Secrecy Act of 1970 and delayed the initiation of civil forfeiture proceedings for eighteen months. In the Supreme Court, the claimant argued that the eighteen month delay between seizure and the civil forfeiture trial violated her due process right to have a meaningful hearing at a meaningful time. Id. at 562-3, 103 S.Ct. at 2010-11; see Armstrong v. Manzo, 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965). The Court analyzed the claim by applying the test of Barker v. Wingo, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), which assesses when a delay in trying a criminal case violates the Sixth Amendment. The Barker test involves a weighing of four factors: The length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant. Id. at 530, 92 S.Ct. at 2191. The Court described the appropriateness of the test in the forfeiture context as follows:
 
 
 28
 Of course, Barker dealt with the Sixth Amendment right to a speedy trial rather than the Fifth Amendment right against deprivation of property without due process of law. Nevertheless, the Fifth Amendment claim here--which challenges only the length of time between the seizure and the initiation of the forfeiture trial--mirrors the concern of undue delay encompassed in the right to a speedy trial. The Barker balancing inquiry provides an appropriate framework for determining whether the delay here violated the due process right to be heard at a meaningful time.
 
 
 29
 United States v. $8,850, 461 U.S. at 564, 103 S.Ct. at 2012.
 
 
 30
 In applying Barker, the Court held that the eighteen month delay did not violate due process. Id. at 569-70, 103 S.Ct. at 2014-15. While the delay was significant, the government had valid justifications, and no evidence existed that the claimant had asserted her right to an early forfeiture trial as permitted by the relevant statute. Moreover, in assessing the prejudice element in Barker, the Court stated that its inquiry focussed on whether the delay had hampered the claimant's defense on the merits. Id. at 569, 103 S.Ct. at 2014. Finding no prejudice, and in light of the other factors, the Court found no constitutional error. Id.
 
 
 31
 We conclude that the Barker test, as described in United States v. $8,850, applies here. While the Caraballos do not claim that the government delayed their trial, they challenge the absence of a hearing between the imposition of restraints on their assets and trial. The essence of this claim is the denial of a meaningful hearing at a meaningful time, precisely the issue considered in United States v. $8,850. Id. at 562-63, 103 S.Ct. at 2010-11.
 
 
 32
 In applying the Barker test, we conclude that the delay of approximately eight months between the initial restraints and trial is not significant. Most federal criminal proceedings will occur fairly rapidly under the Speedy Trial Act, 18 U.S.C. Sec. 3161 et seq., and no unusual delay occurred in this case. See United States v. Draine, 637 F.Supp. 482, 485-86 (S.D.Ala.1986) (five month delay between seizure of assets pursuant to 21 U.S.C. Sec. 853 and trial did not violate due process). As to the reason for delaying a hearing until trial, Congress stated the following:
 
 
 33
 Although current law does authorize the issuance of restraining orders in the post-indictment period, neither the RICO nor CCE statute articulates any standard for the issuance of these orders. Certain recent court decisions have required the government to meet essentially the same stringent standard that applies to the issuance of temporary restraining orders in the context of civil litigation and have also held the Federal Rules of Evidence to apply to hearings concerning restraining orders in criminal forfeiture cases. In effect, such decisions allow the courts to entertain challenges to the validity of the indictment, and require the government to prove the merits of the underlying criminal case and forfeiture counts and put on witnesses well in advance of trial in order to obtain an order restraining the defendant's transfer of property alleged to be forfeitable in the indictment. Meeting such requirements can make obtaining a restraining order--the sole means available to the government to assure the availability of assets after conviction--quite difficult. In addition, these requirements may make pursuing a restraining order inadvisable from the prosecutor's point of view because of the potential for damaging premature disclosure of the government's case and trial strategy and for jeopardizing the safety of witnesses and victims in racketeering and narcotics trafficking cases who would be required to testify at the restraining order hearing. [Footnote Omitted]
 
 
 34
 S.Rep. No. 225 at 196, reprinted in U.S. Code Cong. & Admin.News at 3374. We find these reasons for delaying a full-blown hearing on the merits of the government's case until trial to be substantial, particularly in light of the government's compelling regulatory interest in preventing crime. See United States v. Salerno, 481 U.S. 739, 107 S.Ct. 2095, 2103, 95 L.Ed.2d 697 (1987). Also, we do not ignore Congress' determination of its need to comply with the Fifth Amendment.
 
 
 35
 The third Barker factor--the defendant's assertion of his right to a judicial hearing--also weighs against appellants since they do not point to, and the record does not disclose, any motion for a hearing to contest the government's restraints. Although the statute does not require the district court to hold a post-restraint hearing, the legislative history evidences that such a hearing may be held to determine whether legitimate assets--those outside the scope of the indictment--have been wrongfully restrained. Also, "[i]f a claimant believes the initial seizure was improper, he could file a motion under Federal Rule of Criminal Procedure 41(e) for a return of seized property." United States v. $8,850, 461 U.S. at 569, 103 S.Ct. at 2014. The appellants did not employ any of these procedures. Thus, nothing in the record indicates that appellants desired an early hearing to contest the government's restraints.
 
 
 36
 The final Barker element requires that we assess prejudice suffered by the defendant resulting from the absence of a post-restraint hearing. The clear danger posed by this statutory scheme is the possibility that perfectly legitimate assets will be wrongfully restrained. In such a circumstance, a defendant will incur prejudice to his right to enjoy his assets which is not insignificant. However, the fact that seizure is coincidental with charges of criminal violations for which appellants are required to stand trial tends to define the right most significantly prejudiced as the Sixth Amendment right to counsel of choice. Although the right is not absolute, it nevertheless protects the use legitimate assets to retain a lawyer and to pay for the often complex and expensive pretrial preparations required in RICO and CCE cases. See Koblitz, 803 F.2d at 1528. A wrongful deprivation of legitimate assets will severely impair the defense.
 
 
 37
 In balancing the potential prejudice to appellant's Sixth Amendment rights with the other Barker factors, our task is aided by Mitchell v. W.T. Grant Co., 416 U.S. 600, 94 S.Ct. 1895, 40 L.Ed.2d 406 (1974), in which the Court upheld the validity of a Louisiana sequestration statute permitting a seller-creditor holding a lien to secure, ex parte, a writ of sequestration issuable only by a judge. The Court held that due process did not require a hearing prior to the sequestration. Id. at 609, 94 S.Ct. at 1900. As such, Mitchell is not directly on point for the issue we consider here--the necessity of a post-restraint hearing. Yet, the Court's analysis is instructive. The Court recognized that when two parties have property rights in contested assets, a due process analysis must comprehend both interests:
 
 
 38
 The reality is that both seller and buyer had current, real interests in the property, and the definition of property is a matter of state law. Resolution of the due process question must take account not only of the interests of the buyer of the property but those of the seller as well.
 
 
 39
 Id. at 604, 94 S.Ct. at 1898. Similarly, our due process analysis must countenance not only the possible prejudice to appellants' Sixth Amendment rights, but also the government's claim to title in the assets. Furthermore, critical to the Supreme Court's decision upholding the Louisiana sequestration statute was the "judicial control of the process from beginning to end." Id. at 616, 94 S.Ct. at 1904. Here too, the district court controls the pretrial restraint and sequestration process from beginning to end. Specifically, the district court in this case issued warrants freezing the appellants' bank accounts based on DEA affidavits describing how the accounts were connected with criminal activity. Thus, the district court's probable cause determinations provided a significant check on the government's power to restrain legitimate, nonindicted assets.
 
 
 40
 We conclude that the balance of Barker factors indicates that in this case the delay of a post-restraint hearing until trial was reasonable. There is no bright line dictating when a post-restraint hearing must occur, United States v. $8,850, 461 U.S. at 562, 103 S.Ct. at 2010, and, as here, the Speedy Trial Act ensures that the trial will occur promptly. Therefore we find no violation of appellants' rights to due process of law.[7]
 
 E. The Potential for Prosecutorial Abuse
 
 41
 The statutory scheme of section 853 appears to provide an opportunity for prosecutorial abuse. Here, the same government which proposes to convict the defendant at trial has, as a part of its activity, restrained the use of his apparent assets so that he may have to conduct his defense as a pauper with the attendant limitations upon choice of counsel, pretrial investigation and preparation. Appearances would be less alarming if, for example, one who appears to be wealthy is indicted for a serious crime and, contemporaneously, some financial institution files an attachment of all of the defendant's assets. In such a case, the fact that the defendant is, at the time he must prepare for trial, without use of his restrained funds would not be the result of the prosecutor's action. Here, however, the same government that prosecutes also restrains alienation of assets and does so upon an ex parte showing of probable cause. There is the possibility that prosecutors will seek broad, sweeping restraints recklessly or intentionally encompassing legitimate, nonindictable assets. The loss of such legitimate assets would improperly cripple a defendant's ability to retain counsel.
 
 
 42
 Nevertheless, we agree with the Fourth and Tenth Circuits that possibility of prosecutorial abuse does not render the forfeiture statute unconstitutional. See Caplin & Drysdale, 837 F.2d at 648; Nichols, 841 F.2d at 1508. "Courts have ample tools for dealing with situations where prosecutorial misconduct threatens the fairness of the trial." Caplin & Drysdale, 837 F.2d at 648. If the defendant proves at trial or in a collateral proceeding that prosecutors, acting in bad faith, restrained assets which they knew or should have known to have no connection with criminal activity, a conviction would be in great jeopardy due to a denial of the Sixth Amendment right to counsel of choice. See United States ex rel. Ferenc v. Brierley, 320 F.Supp. 406 (E.D.Pa.1970) (defendant's petition for habeas corpus granted because the government violated the Sixth Amendment right to counsel of choice in detaining assets not allegedly involved in the offense charged); People v. Holland, 23 Cal.3d 77, 151 Cal.Rptr. 625, 588 P.2d 765 (1978) (government's failure to return legitimate assets to the defendant constituted a denial of the right to counsel of choice mandating reversal). But where, as here, no prosecutorial bad faith is evident, and the district court has made a determination of probable cause, either on his own or upon the grand jury's return of the indictment, there has been no improper denial of defendant's Sixth Amendment right to counsel of choice.
 
 
 43
 2. The Striking of Surplus Information from the Indictment.
 
 
 44
 We next consider whether the district court improperly modified the indictment. The second superceding indictment charged forty-one defendants with numerous violations of federal narcotics laws. To make the case more manageable, the district court severed the case into three separate trials. The appellants' case was the second to be tried. Accordingly, at the pretrial conference, the district court ordered the prosecutor to strike from the indictment allegations and information concerning co-defendants who appeared in separate trials or who had already pled guilty. The prosecutor complied, supplying copies of the revised indictment to the appellants. In addition, the appellants requested further modifications of the indictment following the government's case-in-chief. For example, counsel for Carlos Caraballo, Sr. stated, "I want the names eliminated from the indictment that have nothing to do with this case." The appellants also requested that certain words in the indictment relating to their overt acts of drug smuggling be stricken. No defendant asked that extraneous charges be put back into the indictment to be used in this trial. The district court granted many of these requests, frequently over the government's objection. In the end, the Assistant U.S. Attorney retyped and renumbered the modified indictment. Without objection from the appellants, the modified indictment was presented to the jury for its deliberation.[8]
 
 
 45
 On appeal, the Caraballo appellants and Jeffrey Bissell make two arguments concerning the revision of the indictment. First, they argue that the failure of the court and the prosecutor to preserve a copy of the modified indictment for appeal violates due process. Second, the revisions of the indictment, together with the court's jury charge, constituted actual and constructive amendments to the indictment without their "informed consent." The appellants contend that actual amendments occurred when the prosecutor deleted portions of the indictment, while the constructive amendment occurred when the district judge instructed the jury in accordance with the modified indictment rather than the original one. The effect of these amendments was to transform the indictment from one alleging a twenty-nine person RICO conspiracy in Count 1 to a smaller sixteen-person conspiracy. The appellants contend that this significant alteration of the indictment violated their Fifth Amendment right to be tried only on charges alleged by a grant jury. We disagree.
 
 
 46
 At the outset, we note that the record in this case is sufficient to allow us to reconstruct the revisions of the indictment, and so we dismiss appellants' due process concerns. More importantly, our scrutiny of the revisions persuades us that no amendments to the indictment, actual or constructive, occurred in this case.
 
 
 47
 The Fifth Amendment provides that "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury...." U.S. Const. amend. V. The purpose of this clause is to limit the jeopardy of an accused "to offenses charged by a group of his fellow citizens acting independently of either prosecuting attorney or judge." Stirone v. United States, 361 U.S. 212, 218, 80 S.Ct. 270, 273, 4 L.Ed.2d 252 (1960). Therefore, an indictment is amended in violation of the Fifth Amendment when it so altered as to charge a different offense from that found by the grand jury. United States v. Miller, 471 U.S. 130, 144-45, 105 S.Ct. 1811, 1819-20, 85 L.Ed.2d 99 (1985). However, it is not unconstitutional for a defendant to be tried on a narrower theory of misconduct than that alleged in the indictment. Id. In Miller, the indictment charged the defendant with mail fraud, alleging that he had defrauded his insurer in connection with a burglary by (1) consenting to the burglary and (2) by lying to the insurer about the value of the loss. Id. at 132, 105 S.Ct. at 1813. The government's evidence concerned only the latter allegation, and the defendant was convicted. The issue presented in Miller was whether a violation of the Fifth Amendment's grand jury guarantee occurred when the defendant was tried and convicted for a fraudulent scheme much narrower, although included in, the scheme alleged in the indictment. Id. at 131, 105 S.Ct. at 1812. The Court held that no Fifth Amendment violation occurred when trial evidence narrowed the indictment's allegations without adding any new offenses. The Court wrote:
 
 
 48
 As long as the crime and the elements of the offense that sustain the conviction are fully and clearly set out in the indictment, the right to a grand jury is not normally violated by the fact that the indictment alleges more crimes or other means of committing the same crime.
 
 
 49
 ....
 
 
 50
 Convictions generally have been sustained as long as the proof upon which they are based corresponds to an offense that was clearly set out in the indictment. A part of the indictment unnecessary to and independent of the allegations of the offense proved may normally be treated as "a useless averment" that "may be ignored."
 
 
 51
 Id. at 136, 105 S.Ct. at 1815 (quoting Ford v. United States, 273 U.S. 593, 602, 47 S.Ct. 531, 534, 71 L.Ed. 793 (1927)) (emphasis added).
 
 
 52
 Here, the district court struck only those parts of the indictment relating to persons and events having little bearing on appellants' trial. The majority of surplus information struck from the indictment resulted from the appellants' requests. Neither the prosecution nor the judge added any new offenses, actually or constructively, to those charged originally by the grand jury. Instead, the government's evidence focused on the appellants' involvement in a felonious scheme that was narrower than, although included in, the scheme alleged in the original indictment. This result is expressly permitted by Miller. In addition, Federal Rule of Criminal Procedure 7(d) allows "the court on motion of the defendant [to] strike surplusage from the indictment or information." Having exercised this right successfully, the appellants cannot now claim error. See Capella v. Zurich General Acc. Liability Ins. Co., 194 F.2d 558, 560 (5th Cir.1952) (counsel may not invite error and then complain of it).[9]
 
 III. CONCLUSION
 
 53
 For the foregoing reasons, the convictions and sentences of Rolando Zaldivar and Carlos Caraballo-Lujan under counts 11 and 12 are VACATED. In all other respects, the judgment of the district court is AFFIRMED.
 
 
 
 *
 Honorable Joel F. Dubina, U.S. District Judge for the Middle District of Alabama, sitting by designation
 
 
 [1]
 The government introduced at trial certified copies of Nicholis' conviction in 1981 for flying marijuana into the United States in violation of 18 U.S.C. Sec. 1952(a)
 
 
 [2]
 The jury rendered the following verdicts:
 (A) Carlos Caraballo, Sr. was found guilty as follows: (1) of involvement in a RICO enterprise, in violation of 18 U.S.C. Sec. 1962(d) and (c) (counts 1 and 2); of engaging in a continuing criminal enterprise, in violation of 21 U.S.C. Sec. 848 (count 3); of importing and possessing cocaine with intent to distribute, in violation of 21 U.S.C. Sec. 952 and 21 U.S.C. Sec. 841(a)(1) (counts 8 and 9); of conspiracy to import and possess cocaine with intent to distribute, in violation of 21 U.S.C. Sec. 963 and 21 U.S.C. Sec. 846 (counts 11 and 12); of traveling in interstate commerce in order to manage and establish a smuggling operation, in violation of 18 U.S.C. Sec. 1952(a)(3) (counts 17, 18, 19, 21); and of tax fraud, in violation of 26 U.S.C. Sec. 7206(1) (counts 24 and 25).
 (B) Carlos Caraballo, Jr. was convicted of the RICO offenses, of importing and possessing cocaine with intent to distribute, of conspiring to import and possess cocaine with intent to distribute, and of traveling in interstate commerce for the purpose of managing a smuggling operation.
 (C) Henry Caraballo was found not guilty of importation of cocaine charged in count 8. However, he was convicted of RICO offenses, of possessing cocaine with intent to distribute, and of conspiracy to import and distribute cocaine.
 (D) Rolando Zaldivar was acquitted of RICO charges, but he was convicted of managing a continuing criminal enterprise and of conspiring to import and distribute cocaine.
 (E) Theophilos Nicholis was acquitted of RICO charges and of traveling in interstate commerce in aid of racketeering (count 16). Nevertheless the jury found him guilty of conspiring to import and distribute cocaine.
 (F) Jeffrey Bissell was convicted of conspiring to import and distribute cocaine.
 
 
 [3]
 21 U.S.C. Sec. 853 is a criminal, as opposed to a civil, forfeiture statute. A criminal forfeiture operates in personam against the defendant, serving as a penalty upon conviction. A civil forfeiture operates in rem against the property itself under the theory that the property is guilty of wrong-doing. See Brickey, Forfeiture of Attorneys' Fees: The Impact Of RICO and CCE Forfeitures On The Right to Counsel, 72 Va.L.Rev. 493, 494-95 (1986). Also, 21 U.S.C. Sec. 853 is virtually identical to the forfeiture provisions in RICO, see 18 U.S.C. Sec. 1963, since both statutes resulted from Congress' revisions of RICO and CCE penalties in the Comprehensive Forfeiture Act of 1984, Pub.L. No. 98-473, 98 Stat. 2040 (1984). Therefore, our discussion and holdings apply equally to the forfeiture provisions in 21 U.S.C. Sec. 853 as to those found in 18 U.S.C. Sec. 1963
 
 
 [4]
 21 U.S.C. Sec. 853(c) provides:
 All right, title, and interest in property described in subsection (a) of this section vests in the United States upon the commission of the act giving rise to forfeiture under this section. Any such property that is subsequently transferred to a person other than the defendant may be the subject of a special verdict of forfeiture and thereafter shall be ordered forfeited to the United States, unless the transferee establishes in a hearing pursuant to subsection (n) of this section that he is a bona fide purchaser for value of such property who at the time of purchase was reasonably without cause to believe that the property was subject to forfeiture under this section.
 
 
 [5]
 The statute does provide two ways in which a third person may defeat the government's title to a defendant's assets in a post-conviction hearing. However, an attorney will not likely be in a position to satisfy the requirements of the statute. Under 21 U.S.C. Sec. 853(n)(6)(A), the third person may petition the court for a hearing subsequent to the entry of a judgment of forfeiture in order to prove that his title to a forfeitable asset preceded the defendant's title or possession. This would be the case, for example, if the third person owned a boat which he innocently leased to a drug smuggler who was subsequently apprehended. Proof of the lessor's non-involvement in the smuggling would likely entitle him to reclaim his boat. An attorney may be expected to have a difficult time proving superior title to his client's assets since legal services are generally not sought until after the commission of the alleged crime. At that point, the government's interest under the relation back provision already predates the attorney's interest. Another way to defeat the government's title in a post-conviction hearing is to prove one's status as a bona fide purchaser for value. Such proof entails a showing that the third person purchased the asset from the defendant without cause to believe that it was subject to forfeiture. 21 U.S.C. Sec. 853(n)(6)(B). It is unlikely that an attorney will ever achieve this status since he is the most likely person to appreciate the forfeitability of his client's assets. In sum, the attorney will usually fail in attempting to defeat the government's title in a post-conviction hearing
 
 
 [6]
 Accord Caplin & Drysdale, 837 F.2d at 646; Moya-Gomez, 860 F.2d at 725; Nichols, 841 F.2d at 1505; contra United States v. Unit No. 7 and Unit No. 8 of Shop In The Grove Condominium, 853 F.2d 1445, 1450-1452 (8th Cir.1988), mandate stayed by United States v. Unit No. 7 and No. 8, 864 F.2d 1421 (8th Cir.1988) (Sixth Amendment requires exemption of assets sufficient to compensate counsel of choice); United States v. Monsanto, 852 F.2d 1400, 1402-04 (2d Cir.1988) (en banc), cert. granted, United States v. Monsanto, --- U.S. ----, 109 S.Ct. 363, 102 L.Ed.2d 353 (1988) (Sixth Amendment requires exemption of attorneys fees from pretrial restraints and forfeiture)
 
 
 [7]
 Contra Moya-Gomez, 860 F.2d at 729 (absence of a hearing in 21 U.S.C. Sec. 853 violates due process when pretrial restraints render a defendant indigent); Grove Condominium, 853 F.2d at 1449 (lack of hearing on the merits violates due process); United States v. Crozier, 777 F.2d 1376, 1383 (9th Cir.1985) (absence of a hearing violates due process)
 
 
 [8]
 Unfortunately, neither the appellants nor the government preserved a copy of this modified indictment for the record in this case
 
 
 [9]
 The Eleventh Circuit, in the en banc decision Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.1981), adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981