[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
March 30, 2012
JOHN LEY
CLERK

No. 11-12178

_____

D. C. Docket No.:3:09-cv-01145-HLA-MCR

JOHN LOVEMAN REESE,

Petitioner - Appellant,

versus

SECRETARY, FLORIDA DEPARTMENT OF CORRECTIONS,
ATTORNEY GENERAL, STATE OF FLORIDA,

Respondents - Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(March 30, 2012)

Before CARNES, PRYOR, and MARTIN, Circuit Judges.

PRYOR, Circuit Judge:

John Loveman Reese, a Florida prisoner sentenced to death for the murder and sexual battery of Charlene Austin, appeals the denial of his petition for a writ of habeas corpus. Reese contends that, during the sentencing phase of his trial, the lead prosecutor made several improper arguments that persuaded the jury to recommend a death sentence, in violation of his right to due process, and that the decision of the Supreme Court of Florida to deny him relief was contrary to or an unreasonable application of clearly established federal law or an unreasonable determination of the facts. 28 U.S.C. § 2254(d). The prosecutor argued that Reese's crime involved "every woman's wors[t] nightmare," explained that there were no mandatory minimum sentences for burglary and rape and the minimum sentence for first-degree murder was life imprisonment with no parole for 25 years, compared Reese with a "cute little puppy" who grew up to become a "vicious dog," and urged the jury to show Reese the "same mercy" he had shown Austin. The Supreme Court of Florida concluded that none of the prosecutor's arguments rose to the level of misconduct that would violate Reese's constitutional right to due process. Because no decision of the United States Supreme Court clearly establishes otherwise, we cannot say that the Supreme Court of Florida unreasonably applied federal law. Moreover, even under a de novo review, none of the prosecutor's comments were improper. We affirm.

2

# I. BACKGROUND

Twenty-five year old Charlene Austin had a lot to live for. She was an attractive and athletic young woman who enjoyed a rich social life filled with family and friends. Austin saw her best friend, Jackie Grier, almost every day and enjoyed spending time with her boyfriend, Nick Olson, a soldier stationed at Fort Stewart, Georgia. Grier had recently ended a relationship with an abusive boyfriend, John Loveman Reese, and Grier too was dating a soldier stationed at Fort Stewart. On weekends, Austin traveled from her home in Jacksonville, Florida, to Fort Stewart, to visit Olson and often stopped en route to visit her parents and cousins. Grier and Austin often traveled together to visit their boyfriends.

On Tuesday, January 28, 1992, Austin went to work after having returned from a trip to Fort Stewart. As a single woman living alone, Austin was conscious of her security and had burglar bars on her windows. But her home would not be a safe place when she returned.

Unbeknownst to Austin, Jackie Grier's former boyfriend, Reese, broke into Austin's home, while she was at work. Reese entered Austin's home around noon by using a pocket knife to open the back door. Reese then hid in a closet and waited for Austin to return from work for the evening.

After Austin arrived home around four o'clock in the afternoon, Reese for hours remained hidden, where he thought about the reasons Grier had ended their relationship. While Reese waited, Austin used the bathroom, took off her work clothes, chatted on the phone with Grier, took a nap, and watched television. Meanwhile, convinced that Austin had something to do with the break-up of his relationship with Grier, Reese steeled himself to attack and murder Austin.

Around ten in the evening, Reese felt confident that Austin had fallen asleep on her sofa so he emerged from the closet. Reese attacked the defenseless Austin and choked her, and she awoke. Austin struggled against Reese while he beat and dragged her to the bedroom. Reese threw Austin onto her bed and continued to choke her until she submitted to his sexual assault. After Reese raped Austin, he strangled her until she was unconscious. Reese then placed Austin, face down, on the floor. Spying an electrical cord near the foot of the bed, Reese grabbed it and wrapped the cord around Austin's neck. Reese pulled the ends of the electrical cord for three to five minutes to slowly choke the life out of Austin. After Reese was sure that Austin was dead, he left her naked body on the floor and went to a nearby Winn-Dixie to buy groceries.

The next day, Grier could not reach Austin, and she began to worry. Grier called her neighbor, Steve Watson, who agreed to accompany her to Austin's

house.  Grier and Watson found the back door of Austin's house unlocked and entered the home.

Grier immediately noticed that Austin's living room was in a state of disarray: broken pieces of knickknacks littered the floor, couch pillows were ruffled and appeared out of place, and the living room table had been carelessly pushed aside.  With what must have been a deep sense of dread, Grier moved toward Austin's bedroom.

What Grier found confirmed her worst fears.  Austin laid dead on the floor, covered with a blanket.  Grier called the police, who later determined that Austin had been strangled with an electrical extension cord that was doubled and wrapped around her neck twice with the ends pulled through the loop.

When Grier returned to her home distraught to meet with Austin's parents, she was surprised to find Reese waiting for her.  Reese professed his love for Grier and asked her to stick by him because something had happened, but Grier was too rattled from seeing Austin's dead body to ask him what he meant.

Grier told Reese that Austin had been murdered and invited him to go outside with her to console Austin's parents.  Reese refused.  Grier noticed that Reese had fresh scratches on his neck, forearm, and back.

After the police found Reese's palm print on Austin's bed, the police questioned Reese, and he confessed to the burglary, rape, and murder. Reese stated initially that he had broken into Austin's home to talk with her about Grier, but Reese admitted later that, before Austin had returned home, he had planned to hurt her. Reese confessed that he had hidden before Austin returned home. Reese also confessed that he emerged from hiding after Austin fell asleep on the sofa, grabbed her around the neck, dragged her into the bedroom, raped her, and then strangled her to death with an electrical cord.

The police arrested Reese, and while awaiting trial, Reese confessed to Grier that he had raped and killed Austin. A grand jury charged Reese with first degree murder, sexual battery with great force, and burglary with assault.

Multiple parties testified at Reese's trial, including Grier, a medical examiner, a forensic expert, and two detectives who stated that, when they had asked Reese if he had decided to hurt Austin while waiting for her to come home, Reese had replied "yes." Reese also testified and confessed to the crimes. The jury found Reese guilty of all three crimes, and the trial court then conducted a separate sentencing proceeding before the jury.

In his closing argument that the murder was "especially heinous, atrocious, or cruel," the prosecutor stated, "I would submit to you that the way that that

6

defendant chose to kill Charlene Austin, what he forced Charlene Austin to experience is every woman's wors[t] nightmare." The defense counsel objected on the ground that the prosecutor's argument violated the "golden rule," which forbids counsel from asking the jury to place itself in the victim's shoes. Although the defense argued that the comment was improper because over half of the members of the jury were women, the court overruled the objection because the prosecutor did not literally ask the jurors to place themselves in the victim's shoes. The prosecutor continued to describe how Reese's crime was especially heinous, atrocious, or cruel:

> Charlene Austin was awaken[ed] from that deep sleep that the defendant had waited for her to fall into when he grabbed her from behind, she didn't know who was grabbing her.

> Here was a stranger in her dark house grabbing her. It was too dark for her to see, to be beaten, to be raped, and then to be slowly strangled. That was her wors[t] nightmare come true.

> And I ask you to look back[] and . . . reflect . . . on the evidence . . . . Was that especially heinous, was that especially atrocious and cruel?

> . . . . I would submit to you that you must determine from the evidence what was going on in Charlene Austin's mind when the defendant was forcing her to endure that nightmare. Ask yourself from the evidence what she was experiencing, what was going through her mind. . . .

> . . . .

[Reese] wants you to forgive what was going through Charlene Austin's mind when she was brutally awakened by that defendant when he grabbed her around the neck. He wants you to forget the horror, the horror that must have been going through her mind as she fought for her life . . . .

. . . [H]e wants you to forget the questions that may have been going through her mind: Who is this? What is he doing to me? What's going on? Why is he pulling me to my bedroom?

He wants you to forget those questions that you know must have been going through your mind . . . .

. . . .

. . . . That struggle with that defendant lasted, I would submit to you, for longer than 30 to 60 seconds. . . . [That time where] Charlene Austin . . . was fighting for her life would have seemed like hours . . . .

. . . .

Now at some point in time, at some point in time after she had been beaten, after she had been raped, she had hoped that she was going to live through this. That he would let her live. That he was going to show mercy on her . . . .

. . . . His treatment of Charlene Austin in his violence . . . from the facts of this murder, and that's what I ask you to look at, the facts going on in Charlene Austin's mind.

The prosecutor explained to the jury that there were no minimum sentences for rape and burglary, and that the minimum sentence for murder was life imprisonment with the possibility of parole in 25 years:

8

[Y]ou're going to be told that on first degree murder, the defendant can get . . . if there is a recommendation of life . . . no chance of parole for 25 years.

The judge is going to tell you this, that on the sexual battery and burglary, that the defendant can face up to live [sic] in prison on those two offenses. But you need to know this, there's no mandatory minimum on these lives [sic]. No minimum mandatory on the murder, there is a minimum mandatory of 25 years, on these other lifes [sic], there's no minimum mandatory, and no one really knows what that means.

The defense objected on the grounds that the comments were misleading, but the prosecutor continued to discuss the lack of mandatory minimums after the court overruled the objection:

There are no minimum mandatory sentences that apply to sexual battery and burglary. The maximum sentence . . . on either one of these is a life sentence. That is, the judge can go from one day in jail up to a life sentence on each of these two offenses with no minimum mandatory.

Now, I expect that the defense is going to argue to you . . . that the judge can give the defendants three life sentences. And that's a possibility. . . . But only that judge can make that decision, and that's the judge's decision if a recommendation of life is given.

Again, I mention to you, there's no minimum mandatory. I would submit to you that the facts relating to a possible prison sentence on these two offenses—the sexual battery and burglary—is not . . . a mitigating circumstance.

Then the prosecutor attempted to discredit the defense's mitigation evidence, especially the testimonies of two teachers that Reese had been a nice, respectful student. The prosecutor told a story about a cute little puppy who grew into a vicious dog. The prosecutor began to compare Reese to the dog, and the defense counsel objected on the ground that further comments of this nature would denigrate Reese. The judge overruled the objection, and the prosecutor continued to compare Reese to the dog in the story: "The person that those people knew years ago no longer exists . . . . Like that cute little puppy, this defendant, like the cute little puppy that [be]came a rabid dog, it became a vicious dog, this defendant, by his actions with Charlene Austin, show him to be a vicious person."

At the end of his closing statement, the prosecutor asked the jury to consider the aggravating and mitigating circumstances and stated that, if the jury applied the law, it would "clearly see that the aggravating circumstances outweigh the mitigating circumstances, and death [is] the proper recommendation." The prosecutor then stated, "I ask you not to be swayed by pity or sympathy for the defendant. What pity or sympathy did he show to Charlene Austin?" The prosecutor continued, "[I]f you are to . . . show pity or mercy or sympathy to this defendant, I ask you to do this: I ask you to show that defendant the same

10

sympathy, the same mercy, the same pity that he showed to Charlene Austin, and that was none." The defense did not object.

The trial court entered a sentence of death, based on the recommendation of the jury, for the conviction of first-degree murder; a consecutive sentence of 22 years of imprisonment for the conviction of sexual battery with great force; and a consecutive sentence of 22 years imprisonment for the conviction of burglary with assault. The trial court found, as an aggravated circumstance, that Reese had committed the murder while engaged in the commission of the crimes of sexual battery and burglary. The trial court also found that the murder involved two more statutory aggravating factors: Reese had committed the murder in a cold, calculated, and premeditated manner, and the murder was especially heinous, atrocious, and cruel.

The Supreme Court of Florida affirmed Reese's conviction. Reese v. State, 694 So. 2d 678 (Fla. 1997) (Reese I). The court ruled that Reese's argument that the prosecutor had improperly persuaded the jury to recommend a sentence of death in violation of his right to due process was "without merit" because none of the prosecutor's comments were improper:

> We have reviewed the closing argument, and find that the prosecutor
> neither implored the jury to place themselves in the victim's shoes nor
> impermissibly influenced the jury by suggesting Reese could be

paroled if the jury recommended life. Reese argues that the prosecutor's use of a story about a "cute little puppy" who "grew into a vicious dog" was prejudicial. However, evidence of Reese's past character was presented to the jury, so it was not inappropriate for the prosecutor to argue that past character was not a determinant of present character. The story did not constitute name calling, and was not prejudicial. The closing argument did not rise to the level of misconduct. There was no error.

Reese I, 694 So. 2d at 685.

The Supreme Court of Florida affirmed the conviction, but remanded to the trial court to reconsider its sentence of death because its explanation in support of that sentence was deficient. Id. On remand, the trial court revised its sentencing order to explain its reasons in support of its decision to sentence Reese to death. Reese appealed, and the Supreme Court of Florida ordered the trial court to hold a hearing where counsel from both sides could present written and oral arguments. Reese v. State, 728 So. 2d 727 (Fla. 1999) (Reese II). The trial court held a hearing to consider the written and oral arguments of counsel, considered the mitigating evidence, and found the same three statutory aggravating factors that it had found before, no statutory mitigating factors, and seven nonstatutory mitigators: (1) good jail record; (2) positive character traits; (3) support of Jackie Grier and her children; (4) possessive relationship with Jackie Grier; (5) emotional immaturity; (6) possible use of drugs and alcohol around the time of the murder;

12

and (7) lack of a significant criminal record. The trial court imposed a sentence of death after it determined that "the weight of the three statutory aggravating factors is greater than the combined weight of all the mitigating factors. . . . [and] the weight of each of the individual statutory aggravating factors would independently outweigh the combined weight of all of the mitigating factors."

The Supreme Court of Florida affirmed Reese's sentence on August 17, 2000. Reese v. State, 768 So. 2d 1057 (Fla. 2000) (Reese III). On January 8, 2001, Reese petitioned for a writ of certiorari from the United States Supreme Court, but the Court denied that petition. Reese v. Florida, 532 U.S. 910, 121 S. Ct. 1239 (2001) (Reese IV).

Reese filed in Florida court a motion for post-conviction relief and twice amended the motion. The trial court denied relief. Reese appealed, and the Supreme Court of Florida affirmed the decision of the trial court to deny relief. Reese v. State, 14 So. 3d 913 (Fla. 2009) (Reese V).

Reese then filed in the district court a petition for a writ of habeas corpus. 28 U.S.C. § 2254. Reese again alleged that, during the sentencing stage of his trial, the prosecutor had improperly appealed to the jury to recommend a death sentence, and had denied him due process of law as established in Greer v. Miller, 483 U.S. 756, 107 S. Ct. 3102 (1987), and Darden v. Wainwright, 477 U.S. 168,

13

106 S. Ct. 2464 (1986). The district court denied Reese's petition, but granted Reese a certificate of appealability with respect to that claim. The district court denied Reese's motion to expand the certificate of appealability.

## II. STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 governs Reese's petition and limits our review of the decision of the Supreme Court of Florida. 28 U.S.C. § 2254(d). Under section 2254(d), we may not grant habeas corpus relief with respect to any claim that has been adjudicated on the merits in state court proceedings unless the decision of the state court to deny relief "was contrary to federal law then clearly established in the holdings of [the United States Supreme Court]; or . . . involved an unreasonable application of such law; or . . . was based on an unreasonable determination of the facts in light of the record before the state court." Harrington v. Richter, __ U.S. __, 131 S. Ct. 770, 785 (2011) (internal citations and quotation marks omitted). The phrase "clearly established federal law" in section 2254(d) "refers to the holdings, as opposed to the dicta, of [the decisions of the United States Supreme Court] as of the time of the relevant state-court decision." Williams v. Taylor, 529 U.S. 362, 412, 120 S. Ct. 1495, 1523 (2000). "A state court acts contrary to clearly established federal law if it confronts a set of facts that are materially indistinguishable from a decision of the

14

Supreme Court of the United States and nevertheless arrives at a result different from its precedent." Greene v. Upton, 644 F.3d 1145, 1154 (11th Cir. 2011) (internal citations and quotation marks omitted). "The decision of a state court involves an unreasonable application of clearly established federal law if the state court identifies the correct governing legal rule but unreasonably applies it to the facts of the particular state prisoner's case, or when it unreasonably extends, or unreasonably declines to extend, a legal principle from Supreme Court case law to a new context." Id. (internal citations and quotation marks omitted).

"[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Williams, 529 U.S. at 411, 120 S. Ct. at 1522. The "pivotal question" in a federal habeas proceeding is "whether the state court's application of [clearly established federal law] was unreasonable." Harrington, __ U.S. at __, 131 S. Ct. at 785. This inquiry is different from determining whether we would decide de novo that the petitioner's claim had merit. Id. To obtain habeas relief "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in

15

justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Id. at 786–87.

The Supreme Court has made clear that "a habeas court must determine what arguments or theories supported or, [if none were stated], could have supported[] the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme Court]." Harrington, __ U.S. at __, 131 S. Ct. at 786; see also Johnson v. Sec'y, Dep't of Corr., 643 F.3d 907, 910 (11th Cir. 2011). "[E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." Yarborough v. Alvarado, 541 U.S. 652, 664, 124 S. Ct. 2140, 2149 (2004). "[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by [the United States Supreme Court]." Knowles v. Mirzayance, 556 U.S. 111, 122, 129 S. Ct. 1411, 1419 (2009) (internal quotation marks omitted). The standard established in section 2254(d) is "difficult to meet because the purpose of AEDPA is to ensure that federal habeas relief functions as a guard against extreme malfunctions in the state criminal justice systems, and not as a means of error

correction." Greene v. Fisher, __U.S. __, 132 S. Ct. 38, 43 (2011) (citations and internal quotation marks omitted).

"The question whether a state court errs in determining the facts is a different question from whether it errs in applying the law." Rice v. Collins, 546 U.S. 333, 342, 126 S. Ct. 969, 976 (2006). But our standard of review is again deferential. In a habeas proceeding, "[o]ur review of findings of fact by the state court is even more deferential than under a clearly erroneous standard of review." Stephens v. Hall, 407 F.3d 1195, 1201 (11th Cir. 2005).

### III. DISCUSSION

Reese contends that the prosecutor engaged in misconduct when he told the jury that Austin's experience was "every woman's wors[t] nightmare," suggested that Reese would be released on parole absent a sentence of death, compared Reese with a "cute little puppy" who grew up to become a "vicious dog," and urged the jury to show Reese "the same sympathy, the same pity that he showed to Charlene Austin, and that was none." Reese argues that, when measured against the decisions of the Supreme Court in Donnelly v. DeChristoforo, 416 U.S. 637, 94 S. Ct. 1868 (1974), United States v. Young, 470 U.S. 1, 105 S. Ct. 1038 (1985), Darden v. Wainwright, 477 U.S. 168, 106 S. Ct. 2464 (1986), and Greer v. Miller, 483 U.S. 756, 107 S. Ct. 3102 (1987), the Supreme Court of Florida unreasonably

17

concluded that the prosecutor's comments did not "so infect[] the trial with unfairness as to make the resulting conviction a denial of due process," Darden, 477 U.S. at 181, 106 S. Ct. at 2471 (quoting Donnelly, 416 U.S. at 643, 94 S. Ct. at 1871). We disagree.

Reese's argument fails for two separate reasons. First, the Supreme Court of Florida did not unreasonably apply any clearly established federal rule when it rejected Reese's claim of prosecutorial misconduct. Second, even under de novo review, Reese's claim fails because no misconduct occurred as a matter of federal law.

*A. The Supreme Court of Florida Did Not Unreasonably Apply Federal Law.*

Our inquiry is limited to whether the state court unreasonably applied a holding of the Supreme Court, Williams, 529 U.S. at 412, 120 S. Ct. at 1523, and the Supreme Court has never held that a prosecutor's closing arguments were so unfair as to violate the right of a defendant to due process. Reese is not entitled to habeas relief because "it is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by [the Supreme Court]." Knowles, 556 U.S. at 122, 129 S. Ct. at 1419 (internal quotation marks omitted). The Supreme Court has reiterated, time and again, that, in the absence of a clear answer—that is, a holding

18

by the Supreme Court—about an issue of federal law, we cannot say that a decision of a state court about that unsettled issue was an unreasonable application of clearly established federal law. Wright v. Van Patten, 552 U.S. 120, 126, 128 S. Ct. 743, 747 (2008) ("Because our cases give no clear answer to the question presented, let alone one in Van Patten's favor, it cannot be said that the state court unreasonably applied clearly established federal law.") (internal quotation marks omitted); Schriro v. Landrigan, 550 U.S. 465, 478, 127 S. Ct. 1933, 1942 (2007) (The Arizona Supreme Court did not unreasonably apply federal law because "we have never addressed a situation like this."); Carey v. Musladin, 549 U.S. 70, 77, 127 S. Ct. 649, 654 (2006) ("Given the lack of holdings from this Court regarding the potentially prejudicial effect of spectators' courtroom conduct of the kind involved here," the denial of relief by the California Court of Appeal "was not contrary to or an unreasonable application of clearly established federal law.").

None of the decisions of the Supreme Court cited by Reese suggest that the Supreme Court of Florida unreasonably applied federal law. In fact, in every decision, the Supreme Court held that the prosecutor's comments had not violated the defendant's federal rights. Reese has not established "that the state court's ruling on [his due process] claim . . . was so lacking in justification that there was

an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Harrington, 131 S. Ct. at 786–87.

In Darden, every court that reviewed the prosecutor's closing argument—including the Supreme Court of Florida, this Court, and the Supreme Court—condemned it, but "no court . . . held that the argument rendered the trial unfair." 477 U.S. at 179, 106 S. Ct. at 2471. The prosecutor's argument included an invitation to blame state prison officials for the defendant's capital murder because he "was on a weekend furlough from a prison sentence when the crime occurred," statements that "implied that the death penalty would be the only guarantee against a future similar act," references to the defendant as an "animal" who should be on the end of "a leash," and statements that the prosecutor wished someone had "blown away" the defendant with a shotgun. Id. at 180–81 & nn. 9, 10, 11, & 12, 106 S. Ct. at 2471 & nn. 9, 10, 11, & 12. The Supreme Court nevertheless held that the argument "did not deprive the petitioner of a fair trial." Id. at 181, 106 S. Ct. at 2471. The Court explained that, when the prosecutor's improper closing argument was considered in the context of the whole trial, the petitioner's trial was fair:

> The prosecutors' argument did not manipulate or misstate the evidence, nor did it implicate other specific rights of the accused such as the right to counsel or the right to remain silent. Much of the

objectionable content was invited by or was responsive to the opening summation of the defense. . . . The trial court instructed the jurors several times that their decision was to be made on the basis of the evidence alone, and that the arguments of counsel were not evidence. The weight of the evidence against petitioner was heavy; the "overwhelming eyewitness and circumstantial evidence to support a finding of guilt on all charges," reduced the likelihood that the jury's decision was influenced by argument. . . . Defense counsel were able to use the opportunity for rebuttal very effectively, turning much of the prosecutors' closing argument against them by placing many of the prosecutors' comments and actions in a light that was more likely to engender strong disapproval than result in inflamed passions against petitioner. For these reasons, we agree with the District Court below that "Darden's trial was not perfect—few are—but neither was it fundamentally unfair."

Id. at 181–83, 106 S. Ct. 2471–72 (citations omitted).

Darden offers Reese no assistance in establishing that the Supreme Court of Florida unreasonably applied clearly established federal law when it held that the prosecutor's closing argument, which no court has condemned, did not violate Reese's right to due process. Only a holding of the Supreme Court can clearly establish federal law, and the Darden Court held that the prosecutor's argument did not deprive the petitioner of a fair trial. Under Darden, Reese has not established that the ruling of the state court on his due process claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Harrington, 131 S. Ct. at 786–87.

21

Young involved "advocacy . . . [that] has no place in the administration of justice and should neither be permitted nor rewarded," 470 U.S. at 9, 105 S. Ct. at 1043, but the Supreme Court held, on direct appeal, that the prosecutor's improper closing arguments did not rise "to the level of 'plain error' when he responded to defense counsel," id. at 14, 105 S. Ct. at 1046. In rebuttal, the prosecutor "responded to defense counsel's claim that the Government did not believe in its own case," by offering personal expressions of belief in the defendant's guilt. Id. at 5, 105 S. Ct. at 1041. "Viewed in context, the prosecutor's statements, although inappropriate and amounting to error, were not such as to undermine the fundamental fairness of the trial and contribute to a miscarriage of justice." Id. at 16, 105 S. Ct. at 1047.

Young established no rule of federal law that the Supreme Court of Florida unreasonably applied. Only a holding of the Supreme Court can clearly establish federal law, and the Young Court held that the prosecutor's statements did not undermine the fundamental fairness of the trial or contribute to a miscarriage of justice. Under Young, Reese has not established that the ruling of the state court on his due process claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Harrington, 131 S. Ct. at 786–87.

22

Donnelly involved a prosecutor's closing argument that the Supreme Judicial Court of Massachusetts determined was improper, but that the United States Supreme Court nevertheless held did not deprive the petitioner of a fair trial. In response to defense counsel's expression of hope that the jury would find the defendant not guilty, the prosecutor argued that he thought the defense "frankly . . . hope[d] that [the jury would] find [the defendant] guilty of something a little less than first-degree murder." Donnelly, 416 U.S. at 640, 94 S. Ct. at 1870. The trial court sustained an objection to the argument, and the Supreme Court described the argument as "but one moment in an extended trial [that] was followed by specific disapproving instructions." Id. at 645, 94 S. Ct. at 1872.

Donnelly offers Reese no help in establishing that the Supreme Court of Florida unreasonably applied clearly established federal law. Only a holding of the Supreme Court can clearly establish federal law, and the Donnelly Court held that the prosecutor's closing argument did not deprive the petitioner of a fair trial. Under Donnelly, Reese has not established that the ruling of the state court on his due process claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Harrington, 131 S. Ct. at 786–87.

23

Greer involved an improper, but unanswered, question about the defendant's postarrest silence, not an improper closing argument, and the Supreme Court held that "[t]he sequence of events in this case—a single question, an immediate objection, and two curative instructions—clearly indicates that the prosecutor's improper question did not violate [the defendant's] due process rights." 483 U.S. at 766, 107 S. Ct. at 3109. The Court explained that, although the prosecutor attempted to violate the defendant's right against self-incrimnation, under the Fifth and Fourteenth Amendments, as interpreted in Doyle v. Ohio, 426 U.S. 610, 96 S. Ct. 2240 (1976), the prosecutor failed, and "no Doyle violation occurred." Greer, 483 U.S. at 765, 107 S. Ct. at 3108. "The fact of [the defendant's] postarrest silence was not submitted to the jury as evidence from which it was allowed to draw any permissible inference." Id. at 764–65, 107 S. Ct. at 3108.

Greer established no rule that the Supreme Court of Florida unreasonably applied in Reese's appeal. Only a holding of the Supreme Court can clearly establish federal law, and the Greer Court held that the prosecutor's question did not violate the defendant's due process rights. Under Greer, Reese has not established that the ruling of the state court on his due process claim "was so lacking in justification that there was an error well understood and comprehended

24

in existing law beyond any possibility for fairminded disagreement." Harrington, 131 S. Ct. at 786–87.

Reese also argues that several decisions of the Supreme Court of Florida, in other criminal appeals, establish that the prosecutor's arguments in Reese's trial were improper under Florida law, but those decisions are irrelevant to our analysis. "Necessary to [Reese's] success . . . is the proposition that the Florida Supreme Court erred in construing the laws of Florida. In fact, [Reese's] claim involves a pure question of state law. Questions of pure state law do not raise issues of constitutional dimension for federal habeas corpus purposes." Carrizales v. Wainwright, 699 F.2d 1053, 1054–55 (11th Cir. 1983). A precedent of a state court about an issue of state law can never establish an entitlement to a federal writ of habeas corpus. Moreover, even if a decision of a state court interprets federal law, Reese cannot rely on that decision because "under AEDPA, our review is limited to examining whether the highest state court's resolution of a petitioner's claim is contrary to, or an unreasonable application of, clearly established law, as set forth by the United States Supreme Court." Shere v. Sec'y, Fla. Dep't of Corr., 537 F.3d 1304, 1310 (11th Cir. 2008).

Reese also argues that the Supreme Court of Florida unreasonably determined the facts in the light of the evidence before it, but this argument fails

too.  Reese never identifies what facts the state court incorrectly construed or overlooked.

    *B.  Under* De Novo *Review, Reese's Claim of Prosecutorial Misconduct Fails.*

    "Even if [Reese's claim] were eligible for de novo review, it would still fail."  Knowles, 556 U.S. at 123, 129 S. Ct. at 1420.  The Supreme Court has made clear that we are entitled to affirm the denial of habeas relief in this manner: "a habeas petitioner will not be entitled to a writ of habeas corpus if his or her claim is rejected on de novo review."  Berghuis v. Thompkins, ___ U.S. ___, ___, 130 S. Ct. 2250, 2265 (2010); see, e.g., Knowles, 566 U.S. at 114, 129 S. Ct. at 1415 (holding that petitioner failed to establish that his counsel's performance was ineffective under both section 2254(d) and de novo review).  Like the Supreme Court in Knowles, we have employed this approach even when it was clear that the deference afforded by section 2254(d) applied.  See, e.g., Allen v. Sec'y, Fla. Dep't of Corr., 611 F.3d 740, 753 (11th Cir. 2010) ("Alternatively, even if no deference were due the state collateral trial court's decision on the performance element, we would conclude on de novo review that [petitioner] had failed to establish it.").

Darden explains that a defendant must establish that the "prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." 477 U.S. at 181, 106 S. Ct. at 2471 (citations and internal quotation marks omitted). To determine whether a prosecutor's statements during the sentencing phase are "sufficiently egregious to result in the denial of due process," we consider the comments in the context of the entire trial and examine "(1) whether the remarks were isolated, ambiguous, or unintentional; (2) whether there was a contemporaneous objection by defense counsel; (3) the trial court's instructions; and (4) the weight of aggravating and mitigating factors." Land v. Allen, 573 F.3d 1211, 1219–20 (11th Cir. 2009) (relying on Romine v. Head, 253 F.3d 1349, 1369–70 (11th Cir. 2001)). Reese cannot satisfy that standard.

The fundamental problem with Reese's claim of prosecutorial misconduct is that none of the prosecutor's comments in closing argument were improper. "A permissible argument, no matter how 'prejudicial' or 'persuasive,' can never be unconstitutional." Brooks v. Kemp, 762 F.2d 1383, 1403 (11th Cir. 1985) (en banc), vacated on other grounds by 478 U.S. 1016, 106 S. Ct. 3325 (1986), reinstated by 809 F.2d 700 (11th Cir. 1987) (en banc); Romine, 253 F.3d at 1366 ("[N]o matter how outcome-determinative it is a proper argument cannot render

27

the proceedings fundamentally unfair and therefore cannot be the basis for a constitutional violation."); Spivey v. Head, 207 F.3d 1263, 1276 (11th Cir. 2000) ("Proper arguments, regardless of their impact on the outcome of the case, do not render a trial unfair."). "[P]rosecutorial arguments will not warrant habeas corpus relief unless they . . . have encouraged the jury to take into account matters that are not legitimate sentencing considerations." Johnson v. Wainwright, 778 F.2d 623, 630 (11th Cir. 1985).

When we consider whether the prosecutor urged the jury to evaluate legitimate considerations, we must recall that capital sentencing is inevitably an emotional exercise that demands the consideration of morality. Capital sentencing is not a detached and clinical exercise in pure reason:

> [C]apital sentencing is still an emotional issue. Necessarily it will always be so. "Reason" alone cannot adequately explain a jury's decision to grant mercy to a person convicted of a serious murder because of that person's youth or troubling personal problems. Nor can reason alone fully explain the reaction of a juror upon hearing the facts of a particular crime described in their specifically tragic detail. Empathy for a defendant's individual circumstance or revulsion at the moral affront of his crime, reactions accepted as bases for capital sentencing decisions, are not susceptible to full explanation without recourse to human emotion. Thus, the fact that an argument by a defense counsel or prosecutor has emotional overtones does not independently indict it as improper. The propriety of argument rests primarily in the relation of its content to issues relevant to the sentencing jury's concern.

28

Brooks, 762 F.2d at 1404–05 (citation omitted).

Reese argues that the prosecutor's comments about Austin experiencing "every woman's wors[t] nightmare" were improper "golden rule" arguments. Reese argues that the prosecutor invited the jurors to place themselves in the position of Austin because the prosecutor told the jurors that what "Reese forced Charlene Austin to experience is every woman's nightmare"; asked the jurors to "determine from the evidence what was going on in Charlene Austin's mind"; suggested that a series of questions raced through Austin's mind, such as "Who is this? What is he doing to me? What's going on? Why is he pulling me to my bedroom?"; stated that Reese "wants you to forget those questions that you know must have been going through your mind"; and asked the jury to ask themselves "what did Charlene Austin feel after—feel after that rape?" Reese's contention fails.

We agree with the Supreme Court of Florida that the prosecutor did not impermissibly invite "the jury to place themselves in the victim's shoes." Reese I, 694 So. 2d at 685. The prosecutor instead legitimately urged the jury to consider the victim's experience to determine whether the offense was "especially heinous, atrocious, or cruel" under Florida law. To prove that statutory aggravating factor, the State had to prove, beyond a reasonable doubt, that Reese's murder of Austin

was "extremely wicked or shockingly evil"; "outrageously wicked and vile"; or effected by means "designed to inflict a high degree of pain with utter indifference to, or even enjoyment of, the suffering of others." State v. Dixon, 283 So. 2d 1, 9 (Fla. 1973). The victim's fear, pain, and emotional strain before her death are all relevant to the heinous nature of a murder. "The State has a legitimate interest in counteracting the mitigating evidence which the defendant is entitled to put in, by reminding the sentencer that just as the murderer should be considered as an individual, so too the victim is an individual whose death represents a unique loss to society and in particular to his family." Payne v. Tennessee, 501 U.S. 808, 825, 111 S. Ct. 2597, 2608 (1991) (internal quotation marks omitted).

We have ruled that similar comments are permissible. In Kennedy v. Dugger, 933 F.2d 905, 913, 916 (11th Cir. 1991), for example, we denied habeas relief on de novo review where the prosecutor stated, "Can you imagine, in your own living room not bothering a soul on a Saturday afternoon? [The defendant] stopped up at his relative's house and had a beer and he walked back down to your house, and a total stranger, because you got in his way, destroys you." In Davis v. Kemp, 829 F.2d 1522, 1528–29 (11th Cir. 1987), we upheld the following comment as a permissible argument about future dangerousness:

The death penalty is called for.  Ask yourselves this question, how would you feel living in this community if you looked out of your window one night and saw [the defendant] walking down the street coming up toward your house.  If that wouldn't put a feeling of cold terror in your heart, what would?

In Cargill v. Turpin, 120 F.3d 1366, 1381 (11th Cir. 1997), we ruled that a prosecutor's argument at sentencing about "a bunch of little boys" at Christmas thinking about their dead parents was permissible because "the prosecutor was attempting to convey the gravity of the crime and its consequences—the murder of the [boys' parents] left four young boys without parents—to convince the jury that life imprisonment, i.e., allowing [the defendant] to continue to live, would be too lenient a sentence."  And in Brooks, 762 F.2d at 1396, 1416, we denied habeas relief where the prosecutor asked the jurors, "Whose daughter will it be next time?"

Reese also argues that the prosecutor's comments about sentencing law were improper, but we disagree.  The prosecutor accurately stated that, under Florida law, Reese would have been eligible for parole, if the jury had recommended a life sentence, because capital defendants then faced a minimum sentence of twenty-five years.  See State v. Coban, 520 So. 2d 40, 41(Fla. 1988).  A correct statement of the law is a permissible argument.  Cf. Spivey, 207 F.3d at 1277.

31

Reese contends that the prosecutor impermissibly denigrated Reese by comparing him with a "vicious dog" and referring to him as "violent," "pitiless," and "conscienceless." The concurrence agrees that the prosecutor's use of the word "animal" was improper as a matter of federal law. But the prosecutor's comments were permissible because, unlike the prosecutor in Darden, the prosecutor at Reese's trial did not call Reese a "vicious animal." Instead, the prosecutor compared Reese to a "cute little puppy" who "grew into a vicious dog" to argue that past character was not a determinant of present character. Because "evidence of Reese's past character was presented to the jury," Reese I, 694 So. 2d at 685, the prosecutor was entitled to remind the jury that the defense witnesses who testified that Reese had been a well-behaved child did not know Reese as an adult, and the prosecutor was entitled to urge the jury to consider Reese's heinous offense.

Reese argues that the prosecutor's "same mercy" argument was improper, but the prosecutor did not suggest that mercy was an inappropriate factor to consider. Cf. Wilson v. Kemp, 777 F.2d 621, 626 (11th Cir. 1985). The prosecutor's comment presupposed that the jury would consider showing Reese mercy, but the prosecutor legitimately argued that Reese did not deserve mercy. Reese's counsel also failed to object to the "same mercy" comment.

## IV. CONCLUSION

The denial of Reese's petition for a writ of habeas corpus is **AFFIRMED**.

MARTIN, Circuit Judge, concurring in the result only:

While I agree with the majority that this is not a case for habeas relief, I do not agree with all of the reasons given by the majority to affirm the District Court's denial of Mr. Reese's habeas petition.

To begin, after concluding that the Florida Supreme Court's decision was not an unreasonable application of federal law under 28 U.S.C. § 2254(d), I think it unnecessary to also conduct a <u>de novo</u> review of the prosecutor's comments in this case. This is not a case where it is "unclear whether AEDPA deference applies." <u>See</u> <u>Berghuis v. Thompkins</u>, ___ U.S. ___, ___, 130 S. Ct. 2250, 2265 (2010) (stating courts may "deny writs of habeas corpus under § 2254 by engaging in <u>de novo</u> review when it is unclear whether AEDPA deference applies"). Thus, a <u>de novo</u> review is not called for by AEDPA, and it is not necessary for us to affirm the denial of Mr. Reese's habeas petition. Indeed, the Supreme Court has repudiated the notion that AEDPA's "unreasonableness question" is the same as an appellate court's "confidence in the result it would reach under <u>de novo</u> review." <u>Harrington v. Richter</u>, 562 U.S. ___, ___, 131 S. Ct. 770, 786 (2011); <u>cf.</u> <u>Brooks v. Kemp</u>, 762 F.2d 1383, 1403 n.31 (11th Cir.1985) (en banc) ("A court need not determine whether specific [prosecutorial] arguments are proper or improper if, taken as a whole, they would not require relief.") (citation omitted),

vacated on other grounds, 478 U.S. 1016, 106 S. Ct. 3325 (1986), reinstated on remand, 809 F.2d 700 (1987) (en banc).

Also, while I agree that the state court's determination cannot be viewed as "objectively unreasonable," Renico v. Lett, 559 U.S. ___, ___, 130 S. Ct. 1855, 1862 (2010) (quoting Williams v. Taylor, 529 U.S. 362, 409, 120 S. Ct. 1495, 1521 (2000)), I assume that the majority's opinion does not question the premise that the Supreme Court has clearly established federal law with respect to habeas claims asserting that a prosecutor's comments during penalty phase closing arguments denied the petitioner due process. Where a state court has adjudicated such a claim on the merits, habeas petitioners must demonstrate that the state court's decision is contrary to, or involves an unreasonable application of, the Supreme Court's clearly established standard — that "the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" Darden v. Wainwright, 477 U.S. 168, 181, 106 S. Ct. 2464, 2471 (1986) (quoting Donnelly v.DeChristoforo, 416 U.S. 637, 643, 94 S. Ct. 1868, 1871 (1974)). There can be little doubt that a holding of the Supreme Court squarely established this specific due process standard within the meaning of AEDPA. See generally Knowles v. Mirzayance, 556 U.S. 111, 122, 129 S. Ct. 1411, 1419 (2009).

It is true that the Supreme Court has never granted habeas relief based upon a prosecutor's closing argument. But that fact alone does not mean the Supreme Court has not clearly established a standard by which such claims should be evaluated. Said another way, the Supreme Court can clearly establish federal law sufficient to support relief under AEDPA by establishing standards even in cases where the habeas petition is denied under that standard.

Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052 (1984), is a good example. Strickland established the now often cited standard for evaluating ineffective assistance of counsel claims — deficient performance and prejudice. Id. at 687, 104 S. Ct. at 2064. Yet, in Strickland, the Supreme Court affirmed the denial of habeas relief to the petitioner, David Washington, because he failed to make the required showing of either deficient performance or sufficient prejudice to prove his ineffective assistance of counsel claim. Id. at 700–01, 104 S. Ct. at 2071. We know that the Supreme Court has granted habeas relief under AEDPA and based upon Strickland's standard.[1]

---

[1] See, e.g., Lafler v. Cooper, ___ U.S. ___, ___, No. 10–209, 2012 WL 932019, at *11–12 (Mar. 21, 2012); Porter v. McCollum, ___ U.S. ___, ___, 130 S. Ct. 447, 455–56 (2009) (granting habeas relief under AEDPA based on Strickland); Rompilla v. Beard, 545 U.S. 374, 380–81, 393, 125 S. Ct. 2456, 2462, 2469 (2005) (same); Wiggins v. Smith, 539 U.S. 510, 520, 534–38, 123 S. Ct. 2527, 2534, 2542–44 (2003) (same); Williams, 529 U.S. at 367, 120 S. Ct. at 1499 (same). We have followed the Supreme Court's lead. See Cooper v. Sec'y, Dep't of Corr., 646 F.3d 1328, 1356 (11th Cir. 2011); Johnson v. Sec'y, DOC, 643 F.3d 907, 910–11 (11th Cir. 2011); Ferrell v. Hall, 640 F.3d 1199, 1203 (11th Cir. 2011).

It seems equally true that the Supreme Court has clearly announced a constitutional standard by which a prosecutor's arguments must be measured. It bears emphasis, the clearly established standard is "whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" Darden, 477 U.S. at 181, 106 S. Ct. at 2471 (quoting Donnelly, 416 U.S. at 643, 94 S. Ct. at 1871)); see also Greene v. Upton, 644 F.3d 1145, 1157 (11th Cir. 2011) (applying the Darden standard). I therefore understand the majority's opinion to conclude that Mr. Reese has failed to satisfy this rigorous standard, not that Donnelly and Darden can never provide the basis for habeas relief merely because the defendants in those cases got no habeas relief. See also Hammond v. Hall, 586 F.3d 1289, 1322 (11th Cir. 2009) (Carnes, J.) ("The Supreme Court has held that a death sentence can be rendered unconstitutional if the prosecutor's comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" (quoting Darden, 477 U.S. at 181, 106 S. Ct. at 2471, and citing Payne v. Tennessee, 501 U.S. 808, 825, 111 S. Ct. 2608 (1991), for the proposition that "the same due process standard of fundamental fairness exists at the sentencing phase of a capital trial").

Our Circuit precedent recognizes that the Supreme Court may establish constitutional due process standards even in cases where the Court finds no

constitutional error. For example, in United States v. Bissell, 866 F.2d 1343 (11th

Cir. 1989), this Court applied the Supreme Court's analytical framework from

Barker v. Wingo, 407 U.S. 514, 530, 92 S. Ct. 2182, 2192 (1972) (identifying four

factors to consider for Sixth Amendment speedy trial claim), to determine when a

defendant is entitled to a post-indictment, pretrial forfeiture hearing as a matter of

Fifth Amendment due process. Bissell, 866 F.2d at 1352–53. In doing so, this

Court relied upon the Supreme Court's decision in United States v. Eight

Thousand Eight Hundred and Fifty Dollars ($8,850) in United States Currency,

461 U.S. 555, 103 S. Ct. 2005 (1983), which applied Barker's four factors to reject

the argument that an eighteen month delay between seizure of assets and a civil

forfeiture hearing violated Fifth Amendment Due Process, id. at 574, 103 S. Ct. at

2012. See Bissell, 866 F.2d at 1352–53. Bissell, like $8,850, ultimately rejected

the due process claim after applying Barker's test. Id. at 1354. After Bissell, we

made clear in United States v. Kaley, 579 F.3d 1246 (11th Cir. 2009), that the

Barker test was part of the holding of Bissell:

> Bissell's determination that the Barker factors should be used to
> evaluate when a defendant is entitled to a post-indictment, pretrial
> hearing under due process of law is holding, not dicta. As our cases
> frequently have observed, dicta is defined as those portions of an
> opinion that are "not necessary to deciding the case then before us."
> Conversely, the holding of a case is, as the Supreme Court observed,
> comprised both of the result of the case and "those portions of the

opinion necessary to that result by which we are bound." Bissell's conclusion that there was no violation of the defendants' Fifth Amendment due process rights was necessary to its ultimate decision. In fact, Bissell's adoption and use of the Barker test forms a critical part of the case's holding. Our conclusion that the defendants' due process rights were not violated was driven by, and cannot be understood apart from our application of the Barker test to the facts of the case. While it is true that the court could have decided the case on other grounds, such as plain error, the panel resolved the defendant[s'] due process claim by explicating and applying the Barker v. Wingo analysis.

Kaley, 579 F.3d at 1253 n.10 (citations omitted). Similarly, while Darden concluded that the petitioner's due process rights were not violated by the prosecutor's comments, the result in Darden expressly relied upon the Supreme Court's application of Donnelly's due process test to the facts in Darden. Again, that is, "whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" Darden, 477 U.S. at 181, 106 S. Ct. at 2471 (quoting Donnelly, 416 U.S. at 643, 94 S. Ct. at 1871)). Thus, the Donnelly and Darden test is part of the holding in those cases because it was "necessary to [the Court's] ultimate decision," formed "a critical part of the case['s] holding," and "cannot be understood apart" from the Court's ultimate resolution of those cases. Kaley, 579 F.3d at 1253 n.10 (citations omitted). We must therefore recognize it as clearly established federal law.

39

It is also worth noting that to the extent <u>Darden</u> and <u>Donnelly</u> establish only a general standard, that does not immunize a state court's decision from scrutiny under AEDPA. Of course, the "more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." Majority Op. at 17 (quoting <u>Yarborough v. Alvarado</u>, 541 U.S. 652, 664, 124 S. Ct. 2140, 2149 (2004)). For example, <u>Strickland</u> is a general standard. <u>Premo v. Moore</u>, ___U.S. ___, ___, 131 S. Ct. 733, 740 (2011) ("The <u>Strickland</u> standard is a general one, so the range of reasonable applications is substantial.") (quotation marks omitted); <u>accord</u> <u>Knowles</u>, 556 U.S. at 123, 129 S. Ct. at 1420. Yet, as far as I am aware, the first time the Supreme Court found a violation of <u>Strickland</u>'s general standard occurring at a capital penalty phase was under AEDPA. <u>See</u> <u>Williams</u>, 529 U.S. at 396–97, 120 S. Ct. at 1514–15 (concluding state court's application of <u>Strickland</u> to petitioner's penalty phase claim was both contrary to and an unreasonable application of clearly established federal law). Since <u>Williams</u>, the Supreme Court has repeatedly found state court decisions applying <u>Strickland</u>'s general standard unreasonable under AEDPA. <u>See</u> <u>Lafler</u>, 2012 WL 932019, at *11–12; <u>Porter</u>, 130 S. Ct. at 455–56; <u>Rompilla</u>, 545 U.S. at 380–81, 393, 125 S. Ct. at 2462, 2469; <u>Wiggins</u>, 539 U.S. at 520, 537–38, 123 S. Ct. at 2534, 2542–44. And the Supreme Court recently reversed a Georgia Supreme Court opinion on direct review for

40

failing to properly apply Strickland's prejudice analysis. See Sears v. Upton, ___ U.S. ___, ___, 130 S. Ct. 3259, 3261 (2010). These cases show that a state court's decision can be contrary to or an unreasonable application of even a general constitutional standard, such as that stated in Darden, in an appropriate case.

I agree that Mr. Reese's case is not such a case, but my conclusion is based upon the totality of the record and looking to Donnelly and Darden as having clearly established the relevant standard.

Finally, I disagree with the majority's holding that none of the prosecutor's comments in this case were improper. As an example, in Darden itself, the Supreme Court recognized that the prosecutor's use of the word "animal" to describe the defendant "undoubtedly were improper," even though the prosecutor's comments were incorporating the defense's use of the word "animal." 477 U.S. at 180, 106 S. Ct. at 2471. The prosecutor here referred to Mr. Reese as a "vicious dog" and a "rabid dog." Thus, while I agree with the majority's ultimate conclusion that it was not objectively unreasonable for the Florida Supreme Court to conclude the prosecutor's comments did not "so infect[] the trial with unfairness as to make the resulting [death sentence] a denial of due process,"

id. at 181, 106 S. Ct. at 2471 (quotation marks omitted), I cannot agree that none of the prosecutor's comments here were improper as a matter of federal law.