PRYOR, Circuit Judge:
The issue in this appeal is whether a reasonable jurist could conclude that evidence of a capital murderer’s mental health problems, including antisocial personality disorder; his crack cocaine and alcohol abuse; his life of crime, including drug dealing, robberies of drug dealers, and regular use of firearms; and his history of escalating violence, particularly toward women, was likely to be more harmful than helpful if introduced as mitigation during the penalty phase of his trial. Wy-dell Evans shot and killed his brother’s 17-year-old girlfriend, Angel Johnson, two days after being released from prison. During the penalty phase of Evans’s trial, the state presented evidence of his prior *1319 convictions, and Evans’s counsel presented evidence to portray his client in a positive light. The trial court followed the recommendation of the jury that Evans be sentenced to death. In state postconviction proceedings, Evans argued that his counsel had been constitutionally ineffective for failing to discover and introduce evidence that he had suffered a head injury at the age of three and had a long history of mental health and behavioral problems. Three mental health experts testified that Evans suffered from antisocial personality disorder. Lay witnesses also testified about Evans’s long history of violent behavior. For example, Evans’s brother, Oren Evans, testified that Evans was “the angriest, most aggressive person [he had] ever met” and recalled an occasion where Evans had searched for the mother of one of his children only to take her home and “beat[ ] her up and all type of stuff.” And one of Evans’s former teachers stated that she was not “surprised or shocked” when she heard that Evans had murdered someone; she was only “surprised it [had]n’t happened] sooner.” The state trial court ruled that Evans’s claim of ineffective assistance of counsel failed, and the Supreme Court of Florida affirmed on the ground that Evans had failed to prove prejudice because his postconviction evidence of mitigation was more harmful than helpful. Because that decision is reasonable, we affirm the denial of Evans’s petition for a writ of habeas corpus.
I. BACKGROUND
We divide our discussion of the background of this appeal into four sections. First, we discuss the evidence introduced in the guilt phase of Evans’s trial. Second, we discuss the evidence introduced in the penalty phase of Evans’s trial. Third, we discuss Evans’s posteonviction challenges to his sentence in state court. Fourth, we discuss the procedural history of Evans’s petition for a writ of habeas corpus.

A. Guilt Phase

During the guilt phase, the state presented evidence that Evans’s crime had been premeditated. While incarcerated for an earlier parole violation, Evans had engaged in a heated argument with his brother’s 17-year-old girlfriend, Angel Johnson, over the phone and told another prisoner that “[i]f I could get my hands on [Johnson,] I’ll kill that bitch.” Two days after being released from prison, Evans shot and killed Johnson.
The shooting occurred in a car occupied by Johnson, Evans, Lino Odenat, Sammy Hogan, and Erica Foster. The group first stopped for gas. Evans instructed the driver, Hogan, not to stop at the first two gas stations they visited because “too many police” were patrolling the area.
Shortly after leaving the gas station, Johnson and Evans began to argue about Johnson’s alleged unfaithfulness to Evans’s brother, Oren. When Hogan intervened to tell Evans that Johnson was not cheating on his brother, Evans instructed Hogan to stay out of the argument and punched the windshield of the car with sufficient force to crack the windshield. Evans told Johnson, “You’re not going to cheat on my brother like my girlfriend cheated on me.” At some point during the argument, Johnson laughed. Evans responded, “You think it’s funny? You think it’s funny?” Evans then pulled out a gun and pointed it at Johnson. Johnson put her hands up and said, “Alright, Wydell, Alright.” Despite Johnson’s pleading, Evans shot Johnson in the chest.
Johnson fell into Foster’s lap and said, ‘Wydell, you shot me for real. You shot me for real.” Johnson began gasping for air and Odenat tried to roll down a window to give her some air. Evans ordered Odenat *1320 not to roll down the window and stated, “That bitch is dead. She’s dead.” Immediately after shooting Johnson, Evans began threatening the other passengers in the car with the gun and telling them that he would kill them if they told anyone that he had killed Johnson. Evans then ordered Hogan to drive the car to the home of his friend, Jerry Davis.
Evans told Davis that he “missed and shot the girl” and asked Davis if he could borrow some money. Davis gave Evans $40, and Evans returned to the car. Evans ordered Hogan to drive to a nearby parking lot. There Evans warned Foster and Hogan that, if they told anyone that he had shot Johnson, he would kill them, and he would “get the whole family.” Evans told them that he was “dead-ass serious” and “swore on his grandma’s grave” and “to God.” He warned, “If I go to jail I’m going to get out because I’ve done something like this before and I’ve got out before.” He then tried to wipe his fingerprints from the car before allowing Foster and Hogan to take Johnson to the hospital. Despite Evans’s threats, both Foster and Hogan eventually identified Evans as Johnson’s killer. Evans was indicted for first-degree premeditated murder, kidnapping, and aggravated assault.
Evans testified that he had found the gun in the front seat of the car and that the gun had accidentally discharged when he tried to hand it to Johnson in the back seat. He also testified that, although he was “slightly intoxicated” on the night that he shot Johnson, he had a “clear recollection of what happened” and “knew what was going on” at the time. He conceded that, when he shot Johnson, he was “perfectly aware of everything” and “functioning fine.” A Florida jury convicted Evans of all three counts. See Evans v. State, 838 So.2d 1090, 1092 (Fla.2002).

B. Penalty Phase

During the penalty phase, the state proved that Evans had two previous convictions for battery upon a law enforcement officer, a previous conviction for aggravated battery, and that Evans was on probation for felony possession of a firearm and escape when he shot Johnson. Evans’s previous convictions were uncontested. Indeed, Evans testified about three violent felonies that he committed.
Evans’s counsel presented evidence of Evans’s positive characteristics. Several character witnesses described Evans “as a generous man, a good father, a loving and obedient son and grandson, a good friend, and someone who counseled children to stay out of trouble by staying in school.” Evans v. State, 946 So.2d 1, 4 (Fla.2006). Evans’s mother, Lilly Evans, testified that his father had died when Evans was three years old, that she had been addicted to crack cocaine during part of his childhood, that her addiction had contributed to his downfall, and that he had been her inspiration to stop abusing the drug.
Several witnesses testified about Evans’s upbringing and his supportive relationship with some of his family members, particularly his grandmother. Lilly admitted that, although she left her son in his grandmother’s care for a period of time, he had never been deprived physically of anything; he had always had a home in which to live and food to eat; and he had been a “normal” and “obedient” child who had received “okay grades.” Lilly also testified that Evans was close to the five children he had with different women and that the mother of one of his children had died. Evans’s cousin, Minnie Jarrett, testified that Evans’s grandmother raised Evans when his mother was unable to care for him; that his grandmother was a “very religious Christian woman” who “maintained that aspect of her life within her *1321 household”; and that his grandmother was a “[v]ery loving and caring woman” who provided Evans with “the things that he needed, love and support and the material things that he needed.” According to Jarrett, Evans’s grandmother “treated [Evans] like [ ] he was her own son.” A family friend, Linda Key, agreed that Evans had been part of a “loving family” and had been “provided support emotionally, financially, everything.” Evans’s aunt, Sandra Evans, testified that Evans had helped in the care of his grandmother after his grandmother had a stroke. Evans had even changed his grandmother’s diapers and had paid Sandra’s bills while Sandra was caring for his grandmother.
Evans testified about his criminal history. He admitted that, although he had been hurt by his mother’s cocaine addiction, her addiction had not caused him to “los[e] control of [his] identity.” He testified that he had dropped out of school not because his mother had failed to take care of him, but “[b]ecause [he] was engaged in crime. [He] was out there, you know, as they say these days, thuddin’. [He] was doing what a lot of other teenagers do.” Evans also testified about his history of incarceration and some of the details of his crimes. Evans admitted that he was first imprisoned at age 17 and released at age 18. Within seven to nine months after his release, Evans committed another crime for which he returned to prison for two years. After Evans was released again, he committed another crime and was incarcerated for two and a half to three years. Evans admitted that one of his previous crimes involved him “jumpfing] on some dude on a motorcycle.” Another conviction related to an occasion where Evans injured an “officer in the throat.” And yet another conviction involved him “kicking] [an] officer in his ... private area.” Following Evans’s last conviction before this appeal, he was out of prison for about a year before he was incarcerated again for a parole violation. Then, after being out of prison for two days, Evans shot Johnson. See id. at 3.
No evidence of Evans’s mental health was presented during the penalty phase. While preparing for the penalty phase, Evans’s attorney had read a presentencing report in which Evans had reported that his mental health was perfect and that he had seen a psychologist only as a youth. Neither side presented any evidence that Evans suffered from a mental disorder.
The jury recommended a sentence of death by a vote of ten to two, and the trial court sentenced Evans to death for the first-degree murder conviction. The trial court found two aggravating, circumstances: (1) Evans had previously been convicted of violent felonies, Fla. Stat. § 921.141(5)(b), and (2) the crime was committed while Evans was on probation, id. § 921.141(5)(a). See Evans, 946 So.2d at 4. The trial court did not find any statutory mitigators, but found five nonstatutory mitigators: “(1) Evans experienced an abused or deprived childhood; (2) he contributed to society; (3) he performed charitable deeds; (4) he counseled youth to avoid crime and stay in school; and (5) he exhibited good behavior in prison.” Id. at 5 n. 3. The Supreme Court of Florida affirmed Evans’s convictions and death sentence on direct appeal, Evans v. State, 838 So.2d 1090 (Fla.2002), and the Supreme Court of the United States denied his petition for a writ of certiorari, Evans v. Florida, 540 U.S. 846, 124 S.Ct. 121,157 L.Ed.2d 84 (2003).

C. State Postconvietion Proceedings

Evans filed a motion for postconviction relief. The state trial court heard testimony from several lay witnesses and three mental health experts. Evans, 946 So.2d at 5. Evans’s new mitigation evidence, in contrast with the evidence introduced in *1322 the penalty phase of his trial, presented a more troubled and violent history. The new evidence established that Evans had suffered a head injury when he was young, had experienced a troubled childhood, had abused alcohol and drugs, had suffered from poor impulse control, and had exhibited aggression, especially toward women.
Evans had been hit by a car when he was three years old and sustained a “head injury.” Evans’s mother Lilly testified about how Evans’s speech and language patterns had changed after the accident and how Evans had developed a “very, very bad stuttering problem.” Two experts, Dr. Richard Carpenter and Dr. Henry Dee, testified that Evans “had brain damage attributable to his head injury.” Id. at 7. The expert for the state, Dr. Harry McClaren, agreed. Id.
“Dr. Carpenter and Dr. Dee departed from Dr. McClaren over whether Evans’[s] brain damage led to any particular behavior.” Id. at 7-8. Specifically, Dr. Carpenter and Dr. Dee believed that Evans “suffered from an uncontrollable rage reaction or impulse disorder as a result of the brain damage,” but Dr. McClaren “did not agree that Evans’[s] brain dysfunction led him to behave in any particular way.” Id. at 8. Dr. McClaren testified that a “concussion” is a form of a closed head injury and is a “very common experience in life.”
Dr. Carpenter and Dr. Dee also parted ways with Dr. McClaren about whether Evans met the criteria for the two statutory health mitigators, Fla. Stat. §§ 921.141(6)(b), (f). Both Dr. Carpenter and Dr. Dee testified that, because of his impulse disorder, “Evans was under the influence of extreme mental or emotional disturbance at the time of the offense and that Evans’[s] capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired at the time of the offense.” Evans, 946 So.2d at 8. But Dr. McClaren “believed that Evans’[s] actions during the car ride and after the shooting indicated that Evans was in control of the situation and was making the decisions in the car.” Id. at 9. According to Dr. McClaren, Evans understood the criminality of his conduct and did not suffer from extreme mental or emotional disturbance when he killed Johnson. Id.
All three experts discussed how Evans had started to abuse alcohol at a young age. “Both Dr. Carpenter and Dr. McClaren characterized Evans as narcissistic and not wanting to admit anything that puts him in a bad light,” id. at 7, and Dr. Carpenter explained that someone with a narcissistic personality is “someone who is very self-centered, a grandiose sense of themselves.” All three experts testified that Evans probably had antisocial personality disorder. Dr. Carpenter stated unequivocally that “[tjhere is absolutely no doubt” about whether Evans had antisocial personality disorder, and Dr. McClaren agreed that “I don’t think there is much doubt [Evans] meets the criteria for [antisocial personality disorder].” Dr. Carpenter conceded that “in laymen’s terms ... Wydell Evans is diagnosed as a bad dude who commits criminal acts when he’s drunk.” Dr. McClaren agreed that “alcohol consumption was a significant factor in some of [Evans’s] behavioral problems” and testified that Evans had used crack cocaine in the past.
Evans also presented evidence of his long history of behavioral problems and aggression. Lilly contradicted her trial testimony that Evans had been an obedient child and stated instead that “he really [had been] disobedient to [her], getting worse and worse.” Lilly also admitted that she knew that Evans had “got[ten] involved in drugs and the selling of crack cocaine” and had “carr[ied] guns” during *1323 his “teenage years.” Lilly testified that Evans had an “explosive temper.”
Evans’s brother, Oren, testified that Evans “had a very bad temper problem” and described Evans as “the angriest, most aggressive person [he had] ever met.” Oren recounted how Evans had “slapped” two guys for disagreeing with him about who was a better basketball player, Michael Jordan or Scottie Pippen. About this incident, Oren testified that Evans “wanted to be like the man. He wanted to run the show. He was like king of the world, the hardest guy in the world, gangster.” Oren also testified that he had heard about incidents in which Evans threw rocks at a police officer and attacked teachers. He confirmed that Evans was “into guns” and was known to carry guns.
Witnesses also testified about Evans’s history of violence toward women. Oren testified about an occasion in which Evans had tried to find the mother of one of his children. Evans rode “around town looking for her .... [H]e was kicking in doors looking for her. He was just swinging on people, fighting people.” When Evans finally found the woman after a three day search, he took her to his home and started “beating her up and all type of stuff.” The next day, when Oren urged Evans to stop beating the woman, Evans told Oren to “mind [his] own business” and “pulled a gun on [him].” Oren testified that Evans had beaten up his other girlfriends too. One of the mental health experts reported that Evans had admitted that he had once “punched his wife in the mouth for calling him another man’s name.” Another expert testified that Evans had admitted that he had “struck” a “school aide” and “pushed” a teacher.
Several witnesses testified about Evans’s escalating aggression while he was in school. When Evans was still in elementary school, he “was placed in a class for children with learning disabilities and received speech therapy.” Id. at 6. One of the mental health experts testified that, based on his review of Evans’s school record, “his behavior got worse at around twelve and thirteen, which was associated with a number of changes in his life, including starting to use alcohol and starting to be involved in criminal activity.” Barbara McFadden, a high school teacher and counselor, testified that Evans had an average intelligence, but he had learning disabilities. She also testified that when she read in the newspaper that Evans was on trial for murder, she was not “surprised or shocked.” Instead, she was “surprised it [hadn’t] happened] sooner.”
Margaret O’Shaughnessy, a retired counselor for special needs students, remembered Evans because she “felt with all [her] heart that [Evans] was capable of very great violence. It was like he was at a higher plane or level or more disturbed than the other students that we had in the emotional education.” O’Shaughnessy recounted two incidents in which Evans had attacked a student and a teacher. In one incident, he had attacked a female student while she boarded a school bus, and in the other incident, he had pushed a female teacher who had reported him for misbehavior. O’Shaughnessy testified that, at some point, Evans had been “classified as emotionally handicapped and [] recommended for the severely emotionally disturbed program in high school, a program for the most violent students.” Id. at 7.
The postconviction evidence also provided new details about Evans’s criminal activities. The evidence established that Evans had dropped out of school at age 16 and that, by that time, he had “already begun to establish a criminal record involving violent crimes.” Id. By the time he was 28 years old, “he had served eight to nine years in prison and juvenile detention facilities, and was on probation for two *1324 separate felony convictions.” Id. (footnote omitted). At the evidentiary hearing, Evans bragged that he was a “jack boy” because he “rob[bed] drug dealers” and that he only felt “ready” when he had a gun strapped on.
After the trial court weighed all of this evidence, it ruled that Evans had not proved that he was prejudiced by his trial counsel’s failure to discover and present the evidence offered during the evidentia-ry hearing. The Supreme Court of Florida identified Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), as providing the applicable standard and affirmed the decision of the state trial court. The state supreme court declined to address whether defense counsel’s failure to present the additional evidence of mitigation was deficient performance because “Evans ... failed to demonstrate that he was prejudiced.” Evans, 946 So.2d at 12.
The Supreme Court of Florida explained that much of the additional mitigation evidence presented a “double-edged sword” because the evidence “would likely have been more harmful than helpful” or the evidence would have opened the door to damaging evidence:
Evans has failed to establish prejudice because the mitigation evidence he presented at the evidentiary hearing would likely have been more harmful than helpful. “An ineffective assistance claim does not arise from the failure to present mitigation evidence where that evidence presents a double-edged sword.” Reed v. State, 875 So.2d 415, 437 (Fla.2004). While the testimony presented at the evidentiary hearing established that Evans suffered from mental health problems, it also displayed a long history of behavioral problems and escalating violence throughout his school career. Presenting this evidence at the penalty phase would have resulted in the jury hearing about Evans’ aggression towards students and teachers, his aggression towards police officers, his pride in being known as a “jack-boy” because he robs drug dealers, and his habit of carrying a gun. It is just as likely that this evidence would have been more “aggravating” than mitigating. See Reed, 875 So.2d at 436-37 (denying ineffective assistance claim because “even if [defense] counsel had ... investigated further, the testimony that could have been presented was just as likely to have resulted in aggravation against rather than mitigation for [the defendant]”).
Evans, 946 So.2d at 13. The Supreme Court of Florida explained also that the mental health opinion evidence that Evans had been unable to control his actions when he killed Johnson was contradicted by Evans’s own testimony at the guilt phase of his trial that “he. had a ‘clear recollection’ of the shooting because he was focused and in control.” Id. The court concluded that “Evans ha[d] not established that there is a reasonable probability that his sentence would have been different had counsel discovered and presented the mitigation evidence Evans presented at the evidentiary hearing.” Id.

D. Federal Habeas Corpus Proceedings

Evans timely filed a petition for a writ of habeas corpus in the district court. The petition raised fifteen claims, including a claim that trial counsel was ineffective during the penalty phase. The district court “agree[d]” with the Supreme Court of Florida that Evans “had not established prejudice.” Evans v. Sec’y, Dep’t of Corr., No. 6:07-CV-897-orl-28KRS, 2010 WL 3834760, *16 (M.D.Fla. Sept. 29, 2010). The district court explained that the state supreme court “address[ed] the new mitigating evidence in its opinion, and found that although the evidence established [Evans] suffered from mental health prob *1325 lems, the evidence also showed a history of escalating violence.” Id. at *18. The district court agreed with the Supreme Court of Florida that “additional evidence presented at the post-conviction evidentiary hearing would have furthered the view that [Evans] was merely a violent person who had a history of threatening and hitting other people, especially women.” Id. at *17. The district court reasoned that the potential mitigating effect of the evidence that Evans had “suffered from a head injury that may have triggered an impulse control disorder is outweighed by the numerous accounts of violent conduct on the part of [Evans] and the fact that [Evans] testified that he knew what he was doing and was in control when the shooting occurred.” Id. at *18. The district court denied the petition because it could not “say that the state court’s application of the Strickland prejudice standard was objectively unreasonable.” Id. at *19. Evans appealed the judgment of the district court.
A panel of this Court vacated the decision of the district court and remanded the case with instructions to grant the writ of habeas corpus as to the claim of ineffective assistance of counsel during the penalty phase. Evans v. Sec’y, Dep’t of Corr., 681 F.3d 1241 (11th Cir.2012). After Florida filed a petition for rehearing, we vacated the panel decision and ordered rehearing en banc. Evans v. Sec’y, Dep’t of Corr., 686 F.3d 1321 (11th Cir.2012). We directed the parties to brief and argue one issue: whether Evans is entitled to a writ of habeas corpus because his counsel failed, in the penalty phase, to present the mitigating evidence that Evans presented on state collateral review.
II. STANDARD OF REVIEW
“Under [the Antiterrorism and Effective Death Penalty Act of 1996], a federal court may not grant a habeas corpus application ‘with respect to any claim that was adjudicated on the merits in State court proceedings,’ 28 U.S.C. § 2254(d), unless the state court’s decision ‘was contrary to or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States,’ § 2254(d)(1).” Johnson v. Upton, 615 F.3d 1318, 1329 (11th Cir.2010) (quoting Berghuis v. Thompkins, - U.S. -, 130 S.Ct. 2250, 2259, 176 L.Ed.2d 1098 (2010)). “The Supreme Court has described this standard as ‘a highly deferential’ one that ‘demands that state-court decisions be given the benefit of the doubt.’ ” Id. (quoting Renico v. Lett, 559 U.S. 766, 130 S.Ct. 1855, 1862, 176 L.Ed.2d 678 (2010)). The decision of a state court is not “contrary to” federal law unless it “contradicts the United States Supreme Court on a settled question of law or holds differently than did that Court on a set of materially indistinguishable facts.” Cummings v. Sec’y for Dep’t of Corr., 588 F.3d 1331, 1355 (11th Cir.2009) (quoting Kimbrough v. Sec’y, Dep’t of Corr., Fla., 565 F.3d 796, 799 (11th Cir.2009)). The decision of a state court is not an “unreasonable application” of federal law unless the state court “identifies the correct governing legal principle as articulated by the United States Supreme Court, but unreasonably applies that principle to the facts of the petitioner’s case, unreasonably extends the principle to a new context where it should not apply, or unreasonably refuses to extend it to a new context where it should apply.” Id. (quoting Kimbrough, 565 F.3d at 799). “The question under [the Act] is not whether a federal court believes the state court’s determination was correct but whether that determination was unreasonable — a substantially higher threshold.” Id. (quoting Schriro v. Landrigan, 550 U.S. 465, 473, 127 S.Ct. 1933, 1939, 167 L.Ed.2d 836 (2007)).
*1326 The Supreme Court has held that “an unreasonable application of federal law is different from an incorrect application of federal law.” Harrington v. Richter, — U.S.-, 131 S.Ct. 770, 785, 178 L.Ed.2d 624 (2011) (quoting Williams v. Taylor, 529 U.S. 362, 410, 120 S.Ct. 1495, 1522, 146 L.Ed.2d 389 (2000)). “To obtain habeas relief ‘a state prisoner must show that the state court’s ruling on the claim being presented in the federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.’ ” Reese v. Sec’y, Fla. Dep’t of Corr., 675 F.3d 1277, 1286 (11th Cir.2012) (quoting Richter, 131 S.Ct. at 786-87). When evaluating a state prisoner’s petition, “a habe-as court must determine what arguments or theories supported or, [if none were stated], could have supported! ] the state court’s decision; and then it must ask whether it is possible that fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme Court].” Id. at 1286-87 (quoting Richter, 131 S.Ct. at 786).
The Supreme Court has also been clear that “[e]valuating whether a rule application was unreasonable requires considering the rule’s specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.” Richter, 131 S.Ct. at 786 (quoting Yarborough v. Alvarado, 541 U.S. 652, 664, 124 S.Ct. 2140, 2149, 158 L.Ed.2d 938 (2004)). “The Strickland standard is a general one, so the range of reasonable applications is substantial.” Premo v. Moore, — U.S. -, 131 S.Ct. 733, 740, 178 L.Ed.2d 649 (2011) (quoting Richter, 131 S.Ct. at 788).
III. DISCUSSION
To prevail on his claim that his trial counsel rendered ineffective assistance during the penalty phase, Evans must establish “both that trial counsel’s ‘performance was deficient, and that the deficiency prejudiced the defense’ ” during the penalty phase. Ponticelli v. Sec’y, Fla. Dep’t of Corr., 690 F.3d 1271, 1294 (11th Cir.2012) (quoting Wiggins v. Smith, 539 U.S. 510, 521, 123 S.Ct. 2527, 2535, 156 L.Ed.2d 471 (2003)). But if we conclude that the Supreme Court of Florida reasonably applied clearly established federal law when it decided that Evans had failed to establish prejudice, we may affirm the denial of Evans’s petition without addressing whether the performance of his counsel was deficient. As the Supreme Court has explained, “If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.” Strickland, 466 U.S. at 697, 104 S.Ct. at 2069.
To establish prejudice, a petitioner must “show[ ] that counsel’s errors were so serious as to deprive the defendant of a fair trial.” Id. at 687, 104 S.Ct. at 2064. Prejudice is established when “there is a reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different.” Id. at 694, 104 S.Ct. at 2068. “When a [petitioner] challenges a death sentence ..., the question is whether there is a reasonable probability that, absent the errors, the sentencer — including an appellate court, to the extent it independently reweighs the evidence — would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.” Id. at 695, 104 S.Ct. at 2069. “A reasonable probability is a probability sufficient to undermine confidence in the outcome.” Id. at 694, 104 *1327 S.Ct. at 2068. The difference between the reasonable probability standard “and a more-probable-than-not standard is slight and matters ‘only in the rarest case.’ ” Richter, 181 S.Ct. at 792 (quoting Strickland, 466 U.S. at 697, 104 S.Ct. at 2069). “The likelihood of a different result must be substantial, not just conceivable.” Id. at 792. In determining whether there is a reasonable probability of a different result, “we consider ‘the totality of the available mitigation evidence — both that adduced at trial, and the evidence adduced in the habeas proceeding’ — and ‘reweig[h] it against the evidence in aggravation.’ ” Porter v. McCollum, 558 U.S. 30, 130 S.Ct. 447, 453-54, 175 L.Ed.2d 398 (2009) (quoting Williams, 529 U.S. at 397-98, 120 S.Ct. at 1515).
The Supreme Court of Florida reasonably applied Strickland when it ruled that Evans had failed to establish prejudice. The Supreme Court of Florida correctly identified Strickland as the controlling federal law and concluded that Evans could not establish prejudice under Strickland because the mitigation evidence was a “double-edged sword,” Evans, 946 So.2d at 13 (quoting Reed, 875 So.2d at 437), that “would likely have been more harmful than helpful,” id. That conclusion was reasonable in the light of recent decisions of the Supreme Court holding that prejudice had not been established when evidence offered in mitigation was not clearly mitigating or would have opened the door to powerful rebuttal evidence, see Cullen v. Pinholster, — U.S. -, 131 S.Ct. 1388, 179 L.Ed.2d 557 (2011); Wong v. Belmontes, 558 U.S. 15, 130 S.Ct. 383, 175 L.Ed.2d 328 (2009), as well as our several decisions holding that it is reasonable to conclude that a defendant was not prejudiced when his mitigation evidence “was a two-edged sword or would have opened the door to damaging evidence,” Ponticelli, 690 F.3d at 1296 (quoting Cummings, 588 F.3d at 1367).
The decision of the Supreme Court of the United States in Belmontes is instructive. Belmontes argued that his trial counsel had failed to present evidence that he had “suffered an extended bout with rheumatic fever, which led to emotional instability, impulsivity, and impairment of the neurophysiological mechanisms for planning and reasoning.” 130 S.Ct. at 389 (internal quotation marks omitted). Reviewing the issue of prejudice de novo, the Supreme Court held that counsel’s failure to introduce this evidence caused no prejudice to Belmontes because any attempt to portray him in a positive light would have “invited the strongest possible evidence in rebuttal,” id., specifically that Belmontes had been suspected of murder before, id. at 385, and because “the cold, calculated nature of the [previous] murder and Bel-montes’ subsequent bragging about it would have served as a powerful counterpoint” to any evidence that he had acted impulsively when he killed the victim, id. at 389.
Evans’s postconviction evidence of mitigation suffers from the same kind of shortcomings that the Supreme Court identified in Belmontes. The introduction of evidence of Evans’s brain injury and resulting impulse control problems would have “invited the strongest possible evidence in rebuttal” including evidence of his antisocial personality disorder and numerous violent outbursts. See id. And evidence that Evans acted impulsively when he killed Johnson would have been countered by his own testimony that he was focused and in control when he killed Johnson, by testimony that Evans had announced his intent to kill Johnson in advance of doing so, and by testimony about Evans’s calculated actions to cover up his crime. In the light of the similarities between this appeal and Belmontes, we cannot conclude that the decision of the Supreme Court of Florida that Evans failed to establish prejudice *1328 was so objectively unreasonable that it was “beyond any possibility for fairminded disagreement,” Reese, 675 F.3d at 1286 (quoting Richter, 181 S.Ct. at 787), especially when we consider that the decision in Belmontes was on de novo review. See Belmontes, 130 S.Ct. at 386-90.
The reasonableness of the decision of the Supreme Court of Florida is further supported by the decision of the Supreme Court of the United States in Pinholster. There the petitioner argued that the state court had unreasonably applied Strickland by determining that he was not prejudiced when evidence concerning his mental health and “serious substance abuse, mental illness, and criminal problems” among his family members had not been introduced at the penalty phase of his trial. 131 S.Ct. at 1410. After concluding that the failure to present the mental health evidence was not prejudicial because introducing this evidence “would have opened the door to rebuttal by a state expert,” the Supreme Court held that the state court could have reasonably concluded that the failure to present the evidence concerning the petitioner’s family was not prejudicial because the evidence “was by no means clearly mitigating, as the jury might have concluded that Pinholster was simply beyond rehabilitation.” Id.
Evans’s postconviction evidence would have been even more likely to lead a jury to conclude that he “was simply beyond rehabilitation” than the evidence in Pin-holster. See id. Evans’s postconviction evidence established that he had “displayed a long history of behavioral problems and escalating violence.” Evans, 946 So.2d at 13. Evans’s behavioral problems and violence led his brother to describe him as “the angriest, most aggressive person [he had] ever met.” And Evans’s own experts testified that he “suffered from an uncontrollable rage reaction or impulse disorder as a result of the brain damage.” Id. at 8. We cannot conclude that the decision of the Supreme Court of Florida that the postconviction evidence “would likely have been more harmful than helpful,” id. at 13, was an objectively unreasonable application of federal law when the Supreme Court has concluded that less harmful evidence was “by no means clearly mitigating,” Pinholster, 131 S.Ct. at 1410.
The Supreme Court has instructed that we are to determine the arguments supporting the decision of a state court and defer to that decision when “it is possible that fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme Court.]” Richter, 131 S.Ct. at 786. Our precedents applying this standard hold that it is reasonable to treat the kind of evidence that Evans presented in his postconviction hearing as “a ‘two-edged sword.’ ” Suggs v. McNeil, 609 F.3d 1218, 1231 (11th Cir.2010) (quoting Pace v. McNeil, 556 F.3d 1211, 1224 (11th Cir.2009)). We have held, for example, that evidence of an “antisocial personality disorder [or] narcissistic personality disorder ... [is] more harmful ... than mitigating.” Reed v. Sec’y, Fla. Dep’t of Corr., 593 F.3d 1217, 1248 (11th Cir.2010); see also Suggs, 609 F.3d at 1231 (observing that psychopathy “is a trait most jurors tend to look disfavorably upon” (quoting Reed, 875 So.2d at 437)); Cummings, 588 F.3d at 1368 (observing that “a diagnosis of antisocial personality disorder ... is not mitigating but damaging”); Land v. Allen, 573 F.3d 1211, 1222 (11th Cir.2009) (observing that petitioner’s “history of deception and criminality, which ... [was] an integral part of [the expert’s] diagnosis [of antisocial personality disorder], substantially undercuts any potential benefit her mitigation testimony might have had”); Parker v. Sec’y for Dep’t of Corr., 331 F.3d 764, 788 (11th Cir.2003) (observing that antisocial personality disorder is “a diagno *1329 sis the jury might not consider mitigating”). We have held too that evidence of substance abuse “can do as much or more harm than good in the eyes of the jury.” Ponticelli, 690 F.3d at 1297 (quoting Crawford v. Head, 311 F.3d 1288, 1321 (11th Cir.2002)); see also, e.g., Suggs, 609 F.3d at 1231 (observing that evidence of historical drug and alcohol abuse “likely could have caused some jurors to vote in favor of death”); Pace, 556 F.3d at 1224 (observing that “evidence of a defendant’s [substance] addiction is often ‘a two-edged sword’: while providing a mitigating factor, such details may alienate the jury and offer little reason to lessen the sentence”). And we have held that “the indication of brain damage ... can often hurt the defense as much or more than it can help.” Halibur-ton v. Sec’y for Dep’t of Corr., 342 F.3d 1233, 1244 (11th Cir.2003). We have held too that evidence of behavioral problems while attending school may be “potentially damaging” and “unfavorable.” See Suggs, 609 F.3d at 1231-32. In the light of these precedents, a fairminded jurist could conclude that the decision of the Supreme Court of Florida is consistent with the precedents of the Supreme Court of the United States.
Evans argues that Porter compels the conclusion that the Supreme Court of Florida unreasonably applied Strickland because the court failed to consider or unreasonably discounted mitigation evidence presented in the postconviction proceeding, but we disagree. Porter held that it was unreasonable for a state court to conclude that counsel’s failure to present powerful mitigation evidence about his client, a decorated war veteran, was not prejudicial. 130 S.Ct. at 453-54. The Court held that the state court unreasonably discounted the evidence of Porter’s military service by reducing the mitigating effect of heroic service to “inconsequential proportions” because of evidence that Porter had gone absent without official leave on more than one occasion, id. at 455, when there was undisputed evidence that it was “not uncommon” for soldiers in Korea to go absent without official leave in Korea because they “became disoriented and separated from [their] unit,” id. at 450, and that Porter went absent without official leave after returning to the United States to spend time with his son, id. at 450 n. 3. The Court also ruled that it was unreasonable for the Supreme Court of Florida to “discount entirely” the impact that the testimony of Porter’s mental health expert might have had on the jury because the state court disagreed with the conclusions of Porter’s expert and the trial court had found the state expert more credible. Id. at 455.
Porter does not compel the conclusion that the Supreme Court of Florida failed to consider or unreasonably discounted Evans’s postconviction evidence. Nothing in the opinion of the Supreme Court of Florida suggests that the court did not give appropriate mitigating weight to Evans’s postconviction evidence. Instead, the decision of the Supreme Court of Florida establishes that the court considered the evidence and concluded that the mitigation evidence “would likely have been more harmful than helpful.” Evans, 946 So.2d at 13.
Evans’s argument that the Supreme Court of Florida failed to say enough and instead “assumed the evidence was more harmful than helpful,” would require us to decide that the Supreme Court of Florida should have provided a detailed explanation of the mitigating weight given to his postconviction evidence. This approach “smacks of a ‘grading papers’ approach that is outmoded in the post-AEDPA era.” Wright v. Sec’y for Dep’t of Corr., 278 F.3d 1245, 1255 (11th Cir.2002). Even when the mitigating weight given to the postconviction evidence is unclear, we must presume *1330 “that state courts know and follow the law.” Woodford v. Visciotti, 537 U.S. 19, 24, 123 S.Ct. 357, 360, 154 L.Ed.2d 279 (2002). Nothing in Porter allows us to “[r]equir[e] state courts to put forward rationales for their decisions so that federal courts can examine their thinking.” Wright, 278 F.3d at 1255. Instead, we are required to defer to a state court decision even if the decision “is unaccompanied by an explanation.” Richter, 131 S.Ct. at 784.
Judge Martin’s dissent argues that the analysis of prejudice by the Supreme Court of Florida is inconsistent with Porter because the Supreme Court of Florida failed to give mitigating weight to the testimony of Evans’s mental health experts when it deferred to the credibility determination by the state trial court, but this argument misconstrues both Porter and the decision of the Supreme Court of Florida. The Supreme Court of the United States in Porter did not disapprove of the decision of the Supreme Court of Florida to defer to the credibility determination of the trial court for the purpose of determining that Porter had not established statutory mitigation; the Supreme Court instead reversed the decision of the Supreme Court of Florida to discount entirely, as nonstatutory mitigation, the undisputed expert testimony introduced by Porter about his mental health. As the Court explained, “mental health evidence that does not rise to the level of establishing a statutory mitigating circumstance may nonetheless be considered by the sentencing judge and jury as mitigating.” Porter, 130 S.Ct. at 454. The Court concluded that it was “not reasonable to discount entirely the effect” that expert testimony introduced by Porter “regarding the existence of a brain abnormality and cognitive defects ... might have had on the jury or the sentencing judge.” Id. at 455. The assertion of Judge Martin’s dissent that Porter disapproved deferring to a credibility determination by a state trial court is contrary to the face of the opinion of the Supreme Court of the United States itself. In Porter, “the State’s experts [had] identified perceived problems with the tests that [Porter’s expert had] used and the conclusions that he [had] dr[awn] from them,” id. at 455, but none of the experts “testified that he could ... rule out a brain abnormality,” id. at 451. As a result, the testimony of Porter’s expert that Porter suffered from some brain abnormality was undisputed. Porter prohibits a state court from “discounting] entirely” the mitigating effect of undisputed testimony offered in mitigation, but Porter does not prohibit a state appellate court from deferring to a credibility determination made by a trial court. Id. at 454-55. In contrast with Porter, the Supreme Court of Florida acknowledged that the postconviction evidence “established that Evans suffered from mental health problems,” Evans, 946 So.2d at 13, and the court determined that the mitigating effect of this evidence was outweighed by the potential aggravating effect of other evidence introduced during the state postcon-viction hearing. See id. Nothing in the opinion of the Supreme Court of Florida suggests that the mitigating effect of Evans’s mental health problems was “discounted] entirely.” See Porter, 130 S.Ct. at 455.
Evans also argues that the decision of the Supreme Court in Sears v. Upton, — U.S. -, 130 S.Ct. 3259, 177 L.Ed.2d 1025 (2010), establishes that the Supreme Court of Florida failed to understand how the Strickland standard applies in this appeal, but Sears offers Evans no support for at least three reasons. First, unlike the state court decision in this appeal, the decision in Sears was not subject to deferential review under section 2254(d) because the defendant had directly appealed the decision of the state court on state collateral review. Id. at 3261 n. 1. Sec *1331 ond, unlike this appeal, the state court had expressly refused to consider the test for prejudice under Strickland because it had concluded that the task was “impossible.” Id. at 3264. Third, the Supreme Court in Sears did not hold that Sears’s life of crime would necessarily be considered mitigating when presented to a jury. Instead, the Court reasoned that “the fact that Sears’[s] brother ... introduced Sears to a life of crime ... would have been consistent with a mitigation theory portraying Sears as an individual with diminished judgment and reasoning skills.” Id. at 3263.
In contrast with Sears, the Supreme Court of Florida considered the mitigating effect of evidence presented during the postconviction hearing. The court considered whether there was a reasonable probability that Evans would have received a different sentence if Evans’s counsel had introduced this evidence during the penalty phase as Sears instructed. See id. And the court concluded that there was not a reasonable probability that the sentence would have been different because the evidence “would likely have been more harmful than helpful.” Evans, 946 So.2d at 13. Sears did not foreclose the possibility that a state court could reasonably reach this conclusion, nor did Sears even address a situation in which a court is confronted with evidence that is as harmful as it is helpful. Evans’s argument that the decision of the Supreme Court of Florida is unreasonable in the light of Sears fails.
Evans argues that it was unreasonable for the Supreme Court of Florida to conclude that the postconviction evidence was more harmful than helpful because the sentencing court already knew much of the potentially harmful information introduced in the postconviction hearing, but the record establishes otherwise. The sentencing court knew that Evans had a criminal history, but the sentencing court did not know that Evans took pride in his occupation as a “jack boy” who robbed drug dealers. Id. at 7. The sentencing court knew that Evans had committed violent acts in the past, but the sentencing court did not know about Evans’s pattern of violence toward women. The sentencing court did not know that Evans had attacked a female student and a female teacher while in school; the sentencing court did not know that Evans had once searched for the mother of one of his children for three days before taking her home and “beating her up and all type of stuff;” and the sentencing court did not know that Evans had “punched his wife in the mouth for calling him another man’s name.” The sentencing court also did not know that Evans’s temperament was so violent and angry that his brother considered him “the angriest, most aggressive person [he had] ever met,” and that one of his former teachers and counselors was only “surprised it [had]n’t happened] sooner” when she heard that Evans had killed someone. And although the sentencing court knew that Evans had possessed firearms, the court did not know that Evans felt “ready” only when he had a gun, or that he had pulled a gun on his brother.
Judge Martin’s dissent argues that the decision of the Supreme Court of Florida that Evans could not establish prejudice involved an unreasonable determination of the facts because the sentencing court was already “generally aware” of all “four types” of evidence that the Supreme Court of Florida identified as more harmful than helpful, Dissenting Op. of Martin, J., at 1342, 1343, but this argument fails for two reasons. First, to the extent that Judge Martin’s dissent argues that the Supreme Court of Florida made an unreasonable determination of the facts because not all of the evidence was “new,” her dissent *1332 relies on a straw man. Evans, 946 So.2d at 12-13. The Supreme Court of Florida did not even suggest that all of the potentially aggravating evidence that would have been admitted if Evans had pursued a mental health mitigation theory would have been new to the sentencing court. The Supreme Court of Florida instead explained that “[presenting [mental health mitigation] evidence would have resulted in the jury hearing about Evans’[s] aggression towards students and teachers, his aggression towards police officers, his pride in being known as a ‘jack-boy’ because he robs drug dealers, and his habit of carrying a gun.”’ Id. at 13. Judge Martin’s dissent does not dispute that, in fact, the sentencing court would have heard this evidence, and the Supreme Court of Florida reasonably concluded that this evidence would have been more harmful than helpful. Second, the evidence presented at the state postconviction hearing, in any event, included new aggravating evidence concerning Evans’s background. The evidence provided new details about Evans’s violence toward women, his long pattern of violence toward authority figures, his violent criminal activity, and his belief that he was not “ready” unless he had a gun. Judge Martin’s dissent does not dispute that the sentencing court would have heard this new aggravating evidence. Judge Martin’s dissent instead argues that this new evidence is cumulative because the sentencing court “was already generally aware of’ Evans’s background. Dissenting Op. of Martin, J., at 1343. But Judge Martin’s dissent does not, and cannot, explain why “general[] aware[ness]” of Evans’s violent background renders unreasonable the decision of the Supreme Court of Florida that the evidence from Evans’s postconviction hearing, which included both harmful and helpful details about Evans’s background, was more harmful than helpful.
The Supreme Court of Florida reasonably concluded that Evans’s new mental health theory of mitigation was fraught with peril. In response to the evidence about brain damage, the state could have elicited testimony from Dr. Carpenter and Dr. McClaren — an expert from each side— that they had “no doubt” that Evans had antisocial personality disorder and from Dr. Dee that Evans probably had antisocial personality disorder. As we have held consistently, “[t]his evidence is potentially aggravating as it suggests that [Evans] has antisocial personality disorder, which is a trait most jurors tend to look disfavor-ably upon, that is not mitigating but damaging.” Suggs, 609 F.3d at 1231 (internal quotation marks and citation omitted). The state could have elicited testimony from all three mental health experts that Evans had historically consumed alcohol and was often violent when he did so. In particular, the state could have elicited testimony from Evans’s own expert that “Evans [wa]s diagnosed as a bad dude who commits criminal acts when he’s drunk.” “This evidence, alone and in combination with the evidence that [Evans] drank ... before he murdered [Johnson], likely could have caused some jurors to vote in favor of death.” Id. Although Evans’s brain damage is relevant to the extent that it suggests that he has problems controlling his impulses and is less morally culpable for his actions, Evans’s own testimony proves that he was in control when he murdered Johnson. Evans admitted that, although he had been drinking, he had a “clear recollection of what happened” and he “knew what was going on.” The evidence also established that, before he committed the murder, Evans had attempted to avoid law enforcement. Evans conceded that he was “perfectly aware of everything” and was “functioning fine.”
The Supreme Court of Florida reasonably concluded that Evans’s new mental *1333 health theory of mitigation “would have opened the door to damaging evidence.” Cummings, 588 F.3d at 1367 (internal quotation marks omitted). If evidence of Evans’s behavioral problems both in school and after had been introduced, a sentencing court would have heard about Evans’s long history of violence toward authority figures like the police and teachers. If evidence of Evans’s lack of impulse control had been introduced, a sentencing court would have heard of Evans’s violence toward women. If evidence of Evans’s difficulty controlling aggression had been introduced, a sentencing court would have heard damaging testimony by Evans’s own brother that Evans “had a very bad temper problem” and was “the angriest, most aggressive person [he had] ever met.” If evidence of Evans’s escalating pattern of aggression while in school had been introduced, a sentencing court would have heard the chilling observation of Evans’s former school counselor that she “felt with all [her] heart that [Evans] was capable of very great violence,” and that she believed that Evans was even more dangerous than the other children in the emotionally disturbed program. If evidence of Evans’s difficulty complying with the law had been introduced, a sentencing court would have heard about Evans’s affinity for guns, his penchant for robbing drug dealers, and his use of crack cocaine. If evidence that Evans’s behavioral problems had been caused by his childhood had been introduced, a sentencing court would have also heard Evans’s own denial that his childhood had anything at all to do with his life of crime. In the light of the wealth of new potentially harmful evidence introduced at the postconviction hearing, “[i]t is reasonable to doubt that, taken as a whole, [the new] evidence would have impressed a [sentencing court].” Suggs, 609 F.3d at 1230.
IV. CONCLUSION
The denial of Evans’s petition for a writ of habeas corpus is AFFIRMED.